PLATNER
v.
SHERWOOD.        Bill dismissed, without costs.

---

PLATNER *against* SHERWOOD and others.

> A person convicted and attainted of felony, and sentenced to impri-
> sonment for life, prior to the 29th of *March*, 1799, is not *civilly*
> *dead;* and his estate was not, therefore, devested.

*April 6th, and*
*May 8th.*

THE bill stated, that the plaintiff, in 1783, being in-
debted to *Abraham Bachman*, in the sum of £386 14s. 4d.,
on the 25th of *February*, 1783, executed, with *Peter*
*Cooper*, as surety, a bond, to secure that sum.  That in
1787, *judgment* was entered in the Supreme Court,
for the penalty of the bond. (£773 8s. 8d.)  That the
plaintiff made various payments ; and, on the 17th of *Au-*
*gust*, 1798, he and *B.* came to a final settlement of their
accounts, including the judgment debt, and a balance of
$450 was found due to the plaintiff; and *B.* gave a receipt
in full, which was, afterwards, lost, in the manner detailed
in the bill.  That no satisfaction was entered on record of
the judgment.  That, in 1799, the plaintiff was indicted,
tried, and convicted of forgery, alleged in the indictment
to have been committed before the 29th of *March*, 1799.
That the plaintiff was sentenced to the state prison for life,
and imprisoned accordingly, until the 10th of *June*, 1806,
when he was freely and fully pardoned by Governor *Lewis.*
That at the time of the conviction, he was seised in fee
of a number of valuable lots of land, in the military tract.
That *B.*, after the conviction and imprisonment of the

plaintiff, applied to one *Charles Vincent*, with whom the said receipt had been deposited, and got possession of it; and the *judgment* was fraudulently *revived*, in 1799, and a *fi. fa.* issued to the Sheriff of *Ontario*, to levy the penalty of the bond, and the Sheriff sold three lots, amounting to 841 acres, and the undivided part of another lot, for 332 dollars, 28 cents. That *B.* died, and his executors revived the judgment by *sci. fa.* fraudulently, and assigned it to *Jacob R. Van Rensselaer*, who had notice of its being satisfied, or good grounds to believe it. That in 1802, *J. R. V. R.*, as such assignee, fraudulently issued a *fi. fa.* to the Sheriff of *Delaware*, to levy 689 dollars, 48 cents, with interest. That the defendant, *S.*, had the management of that execution, and fraudulently and corruptly caused the lots to be sold for the nominal sum of 402 dollars, 80 cents; and then fraudulently procured an assignment of the judgment for the benefit of himself and the defendant, *Levi Baxter*, and had the execution returned only in part satisfied, and got the defendant, *Walter Wood*, to be interested with him in the speculation, with full notice of all the facts. That in pursuance of the fraudulent design, a *fi. fa.* was issued, in 1803, to the Sheriff of *Cayuga*, to levy 292 dollars, 70 cents, with interest, who sold several military lots belonging to the plaintiff, which are described, for 10 dollars and one cent, though worth 30,000 dollars. That in 1806, they fraudulently issued another *fi. fa.* to the Sheriff of *Onondaga*, to levy 281 dollars, 42 cents, with interest, and sold several military lots there, for 18 dollars and 50 cents, and which were worth 20,000 dollars. That in 1807, they fraudulently issued another execution to the Sheriff of *Seneca*, to levy 459 dollars, 26 cents, with interest, and sold several military lots there, for 25 dollars, which were worth 15,000 dollars. That in 1807, they fraudulently issued another execution to the Sheriff of *Onondaga*, and sold a number of military lots, belonging to the plain-

1822.

PLATNER
v.
SHERWOOD.

tiff.(a) That at the times of such sales, the plaintiff was seised in fee of the said lots. *Prayer,* that the defendants be decreed to quiet the plaintiff in his title to the said lots of land, so sold by the Sheriffs of *Cayuga, Onondaga,* and *Seneca,* by releasing their title thereto, discharged from any act done to defeat the same, and to deliver to him possession thereof, and to account to him for the rents and profits, and for general relief.

The defendant, *Sherwood,* on the 12th of *March,* 1822, put in a *demurrer* to the bill, on the ground, that it appeared, by the bill, that the plaintiff was devested of his estate by the conviction, attainder, and imprisonment, stated in the bill; and it did not appear that he had been subsequently restored thereto; that, therefore, the defendant was not bound to answer the bill; and he prayed to have the same dismissed, with costs.

*April 6th.* *P. Ruggles,* in support of the demurrer, contended, that the plaintiff, by his conviction and sentence to imprisonment for life, for felony, as admitted by the bill, became *civiliter mortuus,* and all his estate in the lands mentioned, if he had any, descended to his heirs. This question was considered and settled by the Court, in the case of *Troup* v. *Wood and Sherwood,* (4 *Johns. Ch. Rep.* 228. 247, 248.) It is there said, that the act, which declared, that where any person shall be convicted of a felony, committed after the 29th of *March,* 1799, and "adjudged to imprisonment for life, in the state prison, should be deemed and taken to be *civilly dead,* to all intents and purposes," was *declaratory* of the common law.

2. That the pardon did not restore the party to rights which had become vested in others, in consequence of his civil death. (*Deming's* case, 10 *Johns. Rep.* 232. 10 *Mod.* 360. 12 *Mod.* 119. 5 *Mod.* 16. 1 *Lev.* 120.

(a) *Vide Troup* v. *Wood and Sherwood,* 4 *Johns. Ch. Rep.* 228. 260.

2 *Mod.* 53.   1 *Sid.* 167.   3 *Mod.* 242.   1 *Saund.* 361.       1822.
*Tomb's* case, 2 *Hawk. P. C.* ch. 37. sec. 54.   *Bac. Abr.*       PLATNER
tit. *Pardon,* H.)                                                     v.
    Again; it does not appear in the bill, that the offence      SHERWOOD.
was committed by the plaintiff before the 29th of *March,*
1799.   It is merely stated, that it was so alleged in the in-
dictment.   He was convicted in *June,* 1799.   It is true,
that the plaintiff is entitled to amend his bill, if this objec-
tion has any weight.

*B. F. Butler,* and *Henry,* contra, contended, 1. That
the plaintiff, by his conviction and sentence to imprison-
ment for life, was not devested of his estate.   It is suffi-
ciently averred in the bill, that the felony, of which the
plaintiff was convicted, was committed prior to the 29th
of *March,* 1799.   This case, therefore, does not come with-
in the statute.   The 17th section of the last *revised* laws,
(1 *N. R. L.* 411. sess. 36. ch. 29.) was originally passed
in a separate statute, on the 29th of *March,* 1799, entitled
" *an act relative to the civil relations of persons sentenced to
imprisonment for life.*" (Sess. 22. ch. 57.)   It enacts,
" that in all cases where any person, hereafter, may be
duly convicted and attainted of any felony, hereafter to be
committed, or of aiding, &c., and shall be adjudged to im-
prisonment for life in the state prison, such person shall be
deemed and taken to be *civilly dead,* to all intents and pur-
poses."   The act is altogether prospective.   It is admitted,
that in cases arising since that act, a pardon will not restore
the party to his estate, which has, by operation of the sta-
tute, been vested in his heirs.   For, although a pardon
creates a new capacity, it does not devest any estate which
has been vested by virtue of the attainder.   (10 *Johns.
Rep.* 232.   *Hawk.* tit. *Pardon,* ch. 37. s. 34. s. 54.)   This
demurrer has, probably, been interposed, in consequence
of what incidentally fell from the Court in *Troup* v. *Wood*

1822.

PLATNER
v.
SHERWOOD.

and *Sherwood ;* but the point was not deemed material in that case, nor much discussed.

2. The act of the 29th of *March,* 1799, was not declaratory of the common law, but created a new rule. If there was any law existing at the time, by which a party, sentenced to imprisonment for life, would have been devested of his estate, as *civiliter mortuus,* there would have been no occasion for that act. The inconvenience, if any was felt, was as great, in regard to antecedent cases, as to those which were to happen after; and if the legislature could have interfered, it would have done so. The act consists of a single enacting clause. There is no preamble, or any expressions whatever to denote that it was a declaratory act, or intended to remove any doubts as to the law. A *declaratory act* not only declares the law as to cases which may arise *in future,* but for those then existing; but the act in question applies solely to cases arising thereafter. Imprisonment for life was a punishment unknown to the common law. How, then, could the act be declaratory ? But if it was declaratory, it, *in effect,* declares, that by the law of the land, persons sentenced to imprisonment for life, for offences committed before the 29th of *March,* 1799, should not be deemed civilly dead ; and so would be fatal to this demurrer. That act, however, was obviously intended to provide for cases which might arise under the new code of criminal law. The act of the 21st of *February,* 1788, (Sess. 11. ch. 37. s. 86. 2 *Greenl.* ed. *Laws,* 73.) punished felonies with *death ;* and declared that all the estate, real and personal, of the felon, should be forfeited to the state. The act of the 26th of *March,* 1796, entitled, " an act making alterations in the criminal law of this state, and for erecting state prisons," declared, " that no conviction of attainder of any person for any offence, except treason, should thereafter work a forfeiture of goods, chattels, lands, tenements, or hereditaments, or of any right therein." (Sess. 19. ch. 30.

3 *Greenl.* ed. *Laws,* 291.) This act, which substituted imprisonment for life in the place of the punishment of death, as to all offences before capital, except treason, murder, and stealing from a church, omitted to declare the *effect* of a sentence to imprisonment for life. (*See the speech of Governor Jay, in January,* 1798, *and his message in* 1799, *Journals of Ass.* p. 2.) The act of the 29th of *March,* 1799, was accordingly passed, to remedy this defect, and to provide for any difficulty in future. The case was new. There was no rule of the common law which expressly applied to it. The punishment of imprisonment for life in the state prison, was a creature of the legislature; and it was for them to declare its effects. The legislature has accordingly declared, that *after* a certain day, a sentence to imprisonment for life shall produce a certain consequence. How, then, can the Court annex that consequence to an offence committed before the time mentioned in the act? But it is said, that if the act of the 29th of *March,* 1799, is not declaratory, it is, at least, in *affirmance* of the common law; and some authorities were cited in the case of *Troup* v. *Wood,* which were supposed to support this position. But the cases in which the *English* authorities declare the party to be *civilly* dead, are those of a monk professed, abjuration of the realm for felony, banishment for life, on attainder of felony, or where, after sentence of death, he is pardoned, on condition of leaving the country. (1 *Bl. Comm.* 132, 133. 4 *Bl. Comm.* 332. *Co. Litt.* 132 *b.* 133 *a.* 2 *Inst.* 201. 3 *Inst.* 217. 4 *Viner's Ab.* 152.) And, in some respects, the situation of a person sentenced to imprisonment for life, is similar to that of a person attainted or banished, &c. But the *civil death* spoken of in the books, is of two kinds : 1. Where there is a total extinction of the civil rights and relations of the party, so that he can neither *take* nor *hold* property, and his heirs succeed to his estate in the same manner as if he were really dead, or the estate is forfeited to the crown : 2. Where there is an incapacity to hold

*1822.*

PLATNER
v.
SHERWOOD.

1822.

PLATNER
v.
SHERWOOD.

property, or to sue in the King's Courts, attended with forfeiture of the estate to the crown. Of the first kind, are the cases of monks professed, and abjuration of the realm; all the other cases are of the second kind. Strictly speaking, there are but *two* cases of civil death; those of a *monk professed*, and an *abjuration* of the realm. For, in the other cases, the party has a capacity to *take*, though not to hold, and may be sued, and even taken in execution. (*Co. Litt.* 2 b. 3 b. 130 a. 3 *Inst.* 213. 215. *Hawk. P. C.* B. 2. ch. 49. s. 50. *Cro. Eliz.* 516. 1 *Wils.* 217.) To devest a party of his estate, during his natural life, for the benefit of *his heirs*, the rule of law must be shown to be strictly applicable to the case. Now, there does not appear any case known to the common law, where the heir inherits during the life of his ancestor, except in the case of a monk professed. *Profession* was a creature of the ecclesiastical law, and the relinquishment of the estate was voluntary. (1 *Domat.* 25. art. 13.) When popery was abolished in *England*, and the monasteries taken into the hands of the king, there was an end to this species of civil death; and abjuration of the realm was abolished by the statute of *James* I. ch. 28. In every other case of civil death, known to the *common* or *civil* law, the offence worked a forfeiture of estate, and corruption of blood, and the king took the property, to the exclusion of the heirs. (*Jackson* v. *Catlin*, 2 *Johns. Rep.* 262. 1 *Domat.* 531. s. 14.) The cases most analogous, though rare, in the *English* law, are those where the party is sentenced to perpetual imprisonment, or perpetual banishment for an offence not attended with a forfeiture of his estate. (2 *Inst.* 199. *Stat. Westm.* I. ch. 20. 2 *Inst.* 201. n. 10. *Stat. Westm.* II. ch. 35. 2 *Inst.* 437. 439.) Though Lord *Coke* comments largely on these cases, he does not say, that civil death was a consequence of the sentence; and he distinguishes between banishment under these statutes of *Westminster* and banishment on abjuring the realm. It seems,

then, that perpetual imprisonment, or perpetual banish-
ment *without forfeiture of the estate*, did not, in *England*,
produce civil death, or, at least, did not devest the party
of his estate. (*Str.* 872. Lord *Raym.* 1572.) But *all
forfeitures* and corruption of blood, as known in *England*,
were abolished in this state, by the act of the 26th *March*,
1796. It follows, then, from this view of the subject, that
if the act of the 29th of *March*, 1799, had not been passed,
that persons sentenced to imprisonment for life under the
new criminal code, would not have been devested of their
estates ; and that the persons sentenced to imprisonment
for life, in the state prison, in the *interim*, between the act
of 1796 and the act of the 29th of *March*, 1799, were not,
by force of the sentence of perpetual imprisonment, de-
vested of their estates. The only plausible argument to
be urged against this conclusion is to be drawn *ab incon-
venienti*. It may be said, that where a person is cut off,
for life, from society, and incapable of discharging any
of its duties, it would be inconvenient, and against public
policy, to permit him to retain his estate. But, arguments
from inconvenience are to be addressed to the legislature,
not to Courts of justice ; and the legislature, perceiving
the inconvenience, did provide a remedy in 1799, as to all
future cases ; and the plaintiff furnishes, perhaps, the only
existing case originating anterior to that act. It may be
asked, if the plaintiff did retain his estate, what could he
do with it, while under the sentence of perpetual imprison-
ment ? We answer, that he might have disposed of it by
deed, or conveyed it to trustees for the benefit of his chil-
dren, or he might have devised it by will. He was still
under the protection of the law ; he could not be whipped
or put to death. He had personal rights. He had a stand-
ing in a Court of justice. *Monks*, or persons *professed*,
might sue in *England*. Why may not the plaintiff,
then, have rights as to his real estate ? Besides, argu-
ments *ab inconvenienti* apply with as much force to sen-

tences to imprisonment for the long periods of 14 and 21 years. Suppose a person sentenced to imprisonment in the state prison for ten years, is pardoned by the Governor, on condition that he leaves the state, and never returns to it again; this is a case of perpetual banishment, authorized by law; and will it be said that, in such a case, the party would be devested of his estate?

3. The various statutory provisions relative to persons sentenced to imprisonment in the state prison, show very strongly the sense of the legislature, that they were not, in consequence of such imprisonment, devested of their estates. In the "act for relief against absent and absconding debtors," passed *March* 21st, 1801, (Sess. 24. ch. 49. sec. 29, 30, 31. 1 *N. R. L.* 157. 164.) it is enacted, "that every person, imprisoned in the state prison, other than persons adjudged to imprisonment for life, for offences committed after the 29th of *March*, 1799, shall be deemed to be an absconding debtor within the act." (Sec. 29.) The surplus, remaining in the hands of the trustees, after payment of the debts, is directed to be applied to the maintenance of the wife and children of the debtor. And when the person is lawfully liberated from prison, the trustees are required to deliver up to him all the real and personal estate remaining in their hands, &c. (Sec. 30.) And in the 31st section, it is enacted, "that where any person so proceeded against, (as an absconding debtor,) has been, or shall be imprisoned for life, for an offence committed previous to the said 29th of *March*, it shall be lawful for the trustees, and they are thereby required, after payment of all the debts due by such person, and retaining sufficient to pay all charges and expenses, *to convey and deliver the residue of the estate, real and personal, of such person, to such person or persons as shall be legally entitled to the same.*" These provisions are not to be found in the old act, relative to absent and absconding debtors, passed *April* 4th, 1786. (Sess. 9. ch. 24. 1 *Greenl.* ed. 214.)

These legislative provisions placed persons sentenced to imprisonment for life, for offences prior to *March* 29th, 1799, on the same footing with persons sentenced for years, and were added, on the revision of the laws, in 1801, in express reference to the act of the 29th of *March*, 1799 ; and because, in those cases, the persons so imprisoned, not being civilly dead, were entitled to their estates ; and, therefore, creditors required legislative aid against them. The several acts being *in pari materia*, must be construed together, and they conclusively show, that, according to the understanding of the legislature, persons in the situation of the plaintiff were not civilly dead. The 31st section of the act is explained by, and is to be taken in connexion with, the 17th section, which directs the trustees, after the payment of all the debts, &c. to pay the surplus to the debtor, *or* his lawful representatives.

4. To annex the incapacity of *civil death*, to the sentence of imprisonment for life, would be contrary to the spirit of the act of *March*, 1796, by which our criminal code was so much ameliorated, and would increase the punishment of the plaintiff, without any legal warrant for that purpose.

THE CHANCELLOR. The question raised by the demurrer, is, whether the plaintiff, upon his conviction and attainder of felony, in *June*, 1799, and consequent imprisonment under the judgment of imprisonment in the state prison for life, became, in contemplation of law, civilly dead, so as to have caused his estate to descend to his heirs. It is admitted, that if his estate had become once vested in his heirs, by reason of his attainder, a subsequent pardon did not restore it to him.

The statute of the 29th of *March*, 1799, enacted, that in all cases where any person should be duly convicted or attainted of any felony, *thereafter* to be committed, and adjudged to imprisonment for life, in the state prison, he

*Margin note:* 1822. PLATNER v. SHERWOOD.

should be deemed and taken to be civilly dead, to all intents and purposes, in the law. But the bill, in this case, states, that the plaintiff was convicted of a felony, charged in the indictment to have been committed *before* the 29th of *March*, and, therefore, the statute does not reach the case.

This same point arose, incidentally, in respect to this same conviction, in the case of *Troup* v. *Wood*, (4 *Johns. Ch. Rep.* 228.) and I was there induced to think, upon the authority of Lord *Coke*, that every person attainted of felony, was accounted, in law, *civiliter mortuus*. It was not a necessary or very material point in that case, and I did not pursue the subject to the extent I should have done, if it had been then, as it is now, the direct and material point in issue. I have, likewise, since, had the benefit of a full and able discussion, and of a diligent and accurate research, particularly on the part of the plaintiff, respecting this very unusual question of law.

*Lord Coke* says, in the passage I formerly referred to, (*Co. Litt.* 130 *a.*) that "besides men attainted in a *præmunire*, every person that is attainted of high treason, petit treason, or felony, is disabled to bring any action, for he is *extra legem positus*, and is accounted, in law, *civiliter mortuus.*" But, if we compare this passage with other parts of the *Institutes*, we shall perceive, that this *dictum* is not to be taken in the full latitude of expression. It is true, that a person attainted of felony, is disabled to bring an action, but it is not true, that he is dead in law, like a person who enters into religion, and becomes a monk professed, according to the example given by *Littleton*. Lord *Coke*, in another place, seems to confine the civil death to persons professed, or who have abjured the realm, or been banished by statute or process of law. (*Co. Litt.* 132 *a. b.* 133 *a.*) and he says, in his third *Institute*, (3 *Inst.* 215.) that there is a great diversity between an attainder of treason or felony, and an entry into religion. He that is at-

tainted of treason or felony, has capacity to purchase lands, to him and his heirs, which he cannot do who enters into religion.

The strict civil death seems to have been confined to the cases of persons professed, or abjured, or banished the realm, and I do not find that it was ever carried further by the common law.

The consequences of the civil death, are illustrated in the case of entry into religion. The executor and the administrator administered upon the personal estate, as in the case of natural death, and the land descended to the heir. (*Litt.* s. 200. *Co. Litt.* 132 *b.*) But even here the fiction was not carried throughout, for the wife was not to be endowed until his natural death, and the person who was professed was entitled to sue *en autre droit.* (*Ibid.*)

A person attainted of felony, and adjudged to imprisonment for life, may have been regarded as dead in law, *sub modo,* but he certainly was not " deemed and taken to be civilly dead, to all intents and purposes in the law," until the act of 1799.

In the case of *Bannister* v. *Trussel,* (*Cro. Eliz.* 516.) it was, upon consideration of the old cases, adjudged in the C. B., in 38 and 39 *Eliz.,* that if an action of debt be brought against a person attainted of felony, he could not plead the attainder in bar, but should be put to answer. Lord *Coke* (3 *Inst.* 215.) referred to that case, and held, that if judgment be given against a man in treason or felony, his body was his own until execution ; and if he was slain before execution, without authority of law, his wife might have an appeal ; for, notwithstanding the attainder, he remained her husband, and his body, after such attainder, might likewise be taken in execution, at the suit of a subject. The reason stated in *Brooke,* and afterwards by *Foster,* (tit. *Appeal,* pl. 5. *Foster's Crown Law,* 62, 63.) why the heir could not also have his appeal, was, because there was the corruption of blood, by reason

of the attainder, between the party and his heir, which dis- solved all relations grounded on consanguinity. This cor- ruption of blood was taken away with us by the statute of the 21st of *February*, 1788, and the ground of that disa- bility in the heir did not exist.

The doctrine of the case in *Croke* was recognised and confirmed by the K. B., in *Ramsay* v. *Macdonald.* (1 *Wils.* 217. *Foster's Crown Law*, 61.) He was charged in a civil suit while under sentence of death for treason; and Sir *John Strange*, the attorney general, moved for his discharge from that process, and it was urged by him, though said "not to be strongly insisted on," that a per- son, under attainder, was *civiliter mortuus;* but Mr. *Henley*, in answer, denied it, because, if he was slain before execu- tion, his wife was entitled to her appeal, and he was likewise enabled to purchase lands to him and his heirs, and might be charged in civil suits, and compelled to plead to the merits, according to *Trussel's* case, already cited. The Court held, that the law had been long settled, that an at- tainted person was liable to civil suits.

In short, as *Foster* observes, (*Ibid.* p. 62, 63.) a person attainted is not absolutely at the disposal of the crown. He is so, for the ends of public justice, and for no other purpose. Until execution, his creditors have an interest in his person for securing their debts, and he is himself under the protection of the law, and to kill him, without warrant of law, is murder. He was, indeed, disabled to sue in his own name, but if beaten or maimed, while under attainder, or if a woman was ravished, while under attain- der, and a pardon afterwards ensued, the party injured might maintain an action, or appeal, as the case might re- quire, for the intermediate injury.

A person who is regarded in law as alive for so many purposes, cannot, surely, have been deemed dead, to the extent of transmitting his estate by descent to his heir. The act of the 26th of *March*, 1796, declared, that no

conviction, or attainder of felony, should work a forfeiture of estate, and, as there was no corruption of blood, or forfeiture of property, consequent on the attainder, and the party could be sued in a civil suit, and as the matrimonial contract continued, and, also, his capacity to purchase lands to himself and his heirs, it could not well be held, prior to the act of *March*, 1799, that an attainder of felony, or imprisonment in pursuance of it, did, *eo instanti*, devest him of his estate, and enable it to descend to his heirs, as in the case of natural death.   The penal consequences of attainder, must be necessary deductions, severely required by the premises ; and as there was to be no forfeiture of estate, the law would not be consistent with itself, if it held the party alive, for the purpose of being sued and charged in execution, and yet dead as to the purpose of transmitting his estate to his heirs.

The case of *Coppin* v. *Gunner*, (2 *Ld. Raym.* 1572. 1 *Barnard. K. B.* 339.) is very applicable to a case like this, where there is no forfeiture; and it shows decidedly the sense of the K. B., in 1730, that the party attainted of felony was not deemed dead so as to pass his estate. The defendant had been convicted under the black act of 9 *Geo.* I. ch. 22. Having received sentence of death, a motion was made for leave to sue him for debt, *it being alleged he had an estate fallen to him*, and there was a proviso in the act that no attainder for any offence made felony by it should work corruption of blood, or forfeiture of estate.   The motion was granted, the plaintiff undertaking not to sue out execution against the body, as there was an application for his transportation.

I am, accordingly, of opinion, upon the reason and authority of the cases, that the demurrer be overruled, and that the defendant, *Sherwood*, within six weeks, answer the bill, and that no costs of this demurrer be charged by either party as against the other.

Order accordingly.