## CHICAGO, R. I. & P. RY. CO. v. CALLICOTTE.*

(Circuit Court of Appeals, Eighth Circuit. June 1, 1920.)

No. 5195.

1. **Judgment** 🗝️➜444—**Fraud warranting equitable relief against.**

Where plaintiff, in an action for personal injury, feigned total paralysis of his legs as a result of his injury, falsely testifying, and causing others to testify, that it had continued from the time of the injury to that of the trial, six months later, and through conspiracy with others fabricated a history of the case showing such continuance, and caused to be produced a temporary paralysis at the times of examination by medical experts, which could not be detected by ordinary medical tests, upon which history and examinations the experts based their testimony that the paralysis was permanent, and such facts were not known to, or discoverable by, the defendant until after judgment, against which it had no remedy at law, the case *held* to warrant injunction.

🗝️➜For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes
*Rehearing denied October 25, 1920.

**2. Courts ⊜⇒508(3)—Federal court has jurisdiction to enjoin enforcement of judgment of state court.**

That a judgment was rendered by a state court does not affect the power of a federal court of equity to enjoin its enforcement, since the injunction acts on the party, and not on the court.

Appeal from the District Court of the United States for the Western District of Missouri; Arba S. Van Valkenburgh, Judge..

Suit in equity by the Chicago, Rock Island & Pacific Railway Company against George A. Callicotte. Decree for defendant, and complainant appeals. Reversed.

John E. Dolman, of St. Joseph, Mo. (Luther Burns, of Topeka, Kan., on the brief), for appellant.

Charles H. Mayer, of St. Joseph, Mo. (K. B. Randolph and Charles F. Strop, both of St. Joseph, Mo., on the brief), for appellee.

Before HOOK, Circuit Judge, and AMIDON and BOOTH, District Judges.

BOOTH, District Judge. This is a suit in equity seeking to enjoin the enforcement of a judgment at law and to set aside the judgment. The judgment was obtained by Callicotte against the railway company in the state circuit court of Buchanan county, Mo., for personal injuries received by him December 28, 1914, while an employé of the railway company. The salient points in the history of the litigation are as follows:

Action was commenced by Callicotte in the state court April 5, 1915. Verdict was rendered and judgment entered in his favor June 23, 1915. On August 7, 1915, a motion for a new trial and a motion in arrest of judgment were made and overruled, and on the same day an appeal was allowed to the state Supreme Court. On December 6, 1916, the bill of complaint in the present case was filed in the District Court for the Western District of Missouri. On July 19, 1917, in the state court in which the personal injury case had been tried, a "motion for an order in the nature of an application for an order for a writ of error coram nobis" was made, by which it was sought to vacate and set aside the judgment of June 23, 1915, on the ground that the judgment had been procured either through fraud or palpable mistake, or upon conjecture. On the same day this motion was overruled, and an appeal taken to the Supreme Court of Missouri from the order overruling the motion. September 25, 1917, upon the trial of the present suit in the United States District Court a decree was entered sustaining a demurrer by the defendant to the plaintiff's evidence, and dismissing the bill. In May, 1918, decisions were rendered in the Supreme Court of the state of Missouri (204 S. W. 528; Id., 204 S .W. 529) affirming the judgment entered June 23, 1915, in the state circuit court of Buchanan county, and also affirming the order of said circuit court in overruling the motion of the railway company for a writ of error coram nobis.

In the complaint in the case at bar plaintiff railway company alleges that Callicotte fraudulently and falsely pretended to receive injuries at the time of the accident which resulted in permanent paralysis

of his lower limbs; that at the time of the trial of the personal injury case in the state court, and prior thereto, Callicotte, being aided by coconspirators, feigned paralysis of his lower limbs, and produced, or caused to be produced, an apparent paralysis of his lower limbs; that said feigned paralysis could not be detected by the usual and ordinary medical tests used for that purpose, although such tests were in fact made by the railway company; that Callicotte testified falsely at the trial that said paralysis was genuine, and the result of personal injuries; that Callicotte after the accident, both before and for some time after the trial, kept himself secreted in his house, so that his true condition should not be ascertained; that during said period he had perfect use of his lower limbs, and made use of them at will; that Callicotte and his coconspirators, by said fraudulent, deceitful, and feigned conduct, caused witnesses to falsely testify at the trial that his lower limbs were paralyzed; that Callicotte and his coconspirators caused him to be fraudulently exhibited to the jury at the trial as a hopeless paralytic; that the court and jury were fraudulently deceived and misled by these fraudulent acts of Callicotte, and by the false testimony of himself and others, who were induced to testify by the false and fraudulent acts of Callicotte; that by reason of the close and watchful care of Callicotte and his coconspirators the railway company was prevented from discovering his real condition, and did not discover it until about January 8, 1916.

The defendant, Callicotte, in his answer in the present suit denied that he had ever feigned paralysis or produced the same; denied that he had conspired to deceive the court, jury, or defendant railway, and denied that he had caused witnesses to testify falsely; denied that there was any false testimony on the trial on the part of himself or his own witnesses; alleged that the question of false testimony and the question of feigned paralysis were issues in the personal injury case tried. He also set up as defense, by way of adjudication, the proceedings by the railway company to obtain a writ of error coram nobis.

At the trial of the present suit in the lower court the plaintiff railway company introduced (1) a complete abstract of record in the personal injury case; (2) a transcript of the evidence given by Callicotte in a case entitled "State of Missouri vs. Callicotte," tried in April, 1916; (3) oral testimony of numerous witnesses. At the close of the plaintiff's case the defendant demurred to the evidence on the ground that the same failed to prove facts sufficient to constitute a cause of action, and, as has already been stated, the demurrer was sustained, and a decree entered dismissing the bill.

It becomes necessary, therefore, to determine (1) what facts were disclosed by the evidence; (2) whether those facts make a case for the equitable relief demanded; (3) whether such relief can be afforded in the federal court.

[1] 1. Among the important facts which are established by the evidence are the following: That on the trial of the personal injury case testimony of plaintiff as to the history of his case was "that since a day or two after the accident, a period of more than six months, he had been completely paralyzed in his lower limbs; that he had no control

over them, or sensation in them"; that before the trial Callicotte had been examined on behalf of the railway company, and also on his own behalf, by several skilled medical men, who made the usual tests to ascertain whether paralysis existed as claimed by Callicotte, and the tests indicated that he had no control over his legs and no sensation in them; that at the time of these several examinations the history of the case up to that time was given to these doctors either by Callicotte or by his regular attending doctor; that this history of the case was a material factor in the conclusions drawn by the expert medical witnesses for Callicotte ·to the effect that this paralysis would be permanent; that one of Callicotte's own medical witnesses who had testified for him on the trial of the personal injury case testified on the trial of the case at bar on behalf of the railway company to the effect "that if in fact Callicotte walked and otherwise used his legs between the time of the accident and· February, 1915, the time when he examined him, it would be his opinion that the paralysis which he found in February, 1915, had been produced by artificial means"; that Callicotte was not paralyzed, as testified by himself, but in fact had the use of his legs, and had actually used them in walking about the house and otherwise, during the whole period from the time of the accident to the time of the trial and thereafter; that it was admitted that Callicotte had had the use of his legs since August 19, 1915, but it was claimed that the paralysis disappeared on that date; that Callicotte, with the aid and understanding of members of his family and his wife's family, kept his true condition concealed from the general public both during the period between the accident and the trial of the personal injury case and thereafter; that he made use of such methods as keeping the blinds of his house drawn and the doors locked when he was up and about, or by making use of a wheel chair; that as late as ·January, 1916, he was discovered one afternoon disguised in women's clothes, going to a coal shed in his back yard; that he remarked at that time, upon being discovered, that "the jig was up"; that Callicotte threatened to kill one of the members of his wife's family if she ever gave him away; that the discovery of the fraud was not made until long after appeal had been taken from the trial court to the Supreme Court,. and that discovery was made possible through a falling-out among the conspirators. The evidence further established that it is possible by the injection of certain drugs to produce and reproduce local temporary paralysis, and that paralysis so produced cannot be distinguished from genuine paralysis, except by observation over an extended period.

We have here, therefore, a conspiracy by Callicotte and others (1) to prevent his true condition and the history· of his case being known; (2) to swear falsely as to his condition and the history of his case; (3) to produce a false condition and fabricate a false history of the case as a basis for testimony by witnesses other than himself. This conspiracy was directed against the defendant, the defendant's witnesses, and certain of the plaintiff's own witnesses, and against the court, and jury. Its purpose was not merely to present a false case for plaintiff, but also to prevent the defendant company from putting in its own case in defense.

2. Do the facts warrant the relief demanded? The circumstances under which a court of equity will restrain the enforcement of a judgment on the ground of fraud has been the source of much litigation both in the federal and state courts. The leading case is U. S. v. Throckmorton, 98 U. S. 61, 25 L. Ed. 93, where it was sought to set aside a patent alleged to have been procured by false testimony and a forged instrument of title. The title had been passed upon by a duly constituted board of commissioners in 1853. The decree of that board had been affirmed by the United States District Court, 1856. The bill attacking the title was filed in 1876. Richardson, the original claimant, was dead. His heirs were not made parties to the suit. In that case the court laid down the following rules:

"Where, by reason of something done by the successful party to a suit, there was in fact no adversary trial or decision of the issue in the case; where the unsuccessful party has been prevented from exhibiting fully his case, by fraud or deception practiced on him by his opponent, as by keeping him away from court, a false promise of a compromise; or where the defendant never had knowledge of the suit, being kept in ignorance by the acts of the plaintiff; or where an attorney fraudulently or without authority assumes to represent a party and connives at his defeat; or where the attorney regularly employed corruptly sells out his client's interest to the other side—these and similar cases, which show that there has never been a real contest in the trial or hearing of the case, are reasons for which a new suit may be sustained to set aside and annul the former judgment or decree, and open the case for a new and a fair hearing."

But the court said further:

"The acts for which a court of equity will on account of fraud set aside or annul a judgment or decree, between the same parties, rendered by a court of competent jurisdiction, have relation to frauds, extrinsic or collateral, to the matter tried by the first court, and not to a fraud in the matter on which the decree was rendered."

In applying these rules to the case under consideration the court said:

"The genuineness and validity of the concession * * * produced by complainant was the single question pending before the board of commissioners and the district court for four years. It was the thing, and the only thing, that was controverted, and it was essential to the decree. To overrule the demurrer to this bill would be to retry, twenty years after the decision of these tribunals, the very matter which they tried, on the ground of fraud in the document on which the decree was made."

The decree of the lower court sustaining a demurrer to the bill and dismissing it on the merits was affirmed.

Vance v. Burbank, 101 U. S. 514, 25 L. Ed. 929, was a suit to set aside a patent and a townsite entry for fraud, consisting of false testimony. A demurrer was sustained to the bill and an appeal taken. In the course of its opinion the court said:

"The operative allegation in this bill is of false testimony only. That testimony Scott had full opportunity of meeting. Rehearings were granted him when the case seemed to require it, and he took all the appeals the law gave. * * * As to the alleged fraud in the description of the compromise line, it is sufficient to say that, according to the bill, this fraud, if it in fact existed, was discovered long before the contest in the land department, and if it had any importance in the case the amplest opportunity was given to show the error and get relief against the agreement."

The Throckmorton Case was cited and followed.

Pacific Railroad Co. v. Missouri Pacific Ry., 111 U. S. 505, 4 Sup. Ct. 583, 28 L. Ed. 498, was a suit to set aside a decree of foreclosure against the plaintiff railroad, on the ground that no real defense has been made in the foreclosure suit on account of the unfaithful conduct of the solicitor and directors of the plaintiff in carrying out an alleged fraudulent scheme. The lower court had sustained a demurrer to the bill. This was reversed, with directions to overrule the demurrer. The Throckmorton Case was cited with approval.

The case of Moffat v. U. S., 112 U. S. 24, 5 Sup. Ct. 10, 28 L. Ed. 623, was a suit by the United States to cancel two patents for land, on the ground of fraud, the fraud being that the patentees were fictitious persons, and the documents had been fabricated by the register and receiver of the land office. In affirming a decree for the government the court in its opinion said:

"A strenuous effort is made by counsel to bring these cases within the doctrine declared in U. S. v. Throckmorton, 98 U. S. 61, and Vance v. Burbank, 101 U. S. 514, but without success. * * * Here officers, constituting a special tribunal, entered into a conspiracy; and the frauds consist of documents which they had fabricated, and presented with their judgment to those having appellate and supervisory authority in such matters; and thus a fictitious proceeding was imposed upon the latter as one which had actually taken place. It was a fraud upon the jurisdiction of the officers of the Land Department at Washington, and not the mere presentation to them of doubtful and disputed testimony."

Arrowsmith v. Gleason, 129 U. S. 86, 9 Sup. Ct. 237, 32 L. Ed. 630, was a suit attacking an order of sale made by a probate court in the state of Ohio. The sale was alleged to have been fraudulently made by the guardian of an infant. The court below sustained a demurrer to the bill. Counsel for appellees in their brief cited the Throckmorton Case, but the court in its opinion made no mention of it. In its opinion the court said:

"While there are general expressions in some cases apparently asserting a contrary doctrine, the later decisions of this court show that the proper Circuit Court of the United States may, without controlling, supervising, or annulling the proceedings of state courts, give such relief, in a case like the one before us, as is consistent with the principles of equity;" citing Barrow v. Hunton, 99 U. S. 80, 25 L. Ed. 407.

Continuing, the court quoted with approval from Johnson v. Waters, 111 U. S. 640, 667, 4 Sup. Ct. 619, 634 (28 L. Ed. 547):

"In such cases the court does not act as a court of review, nor does it inquire into any irregularities or errors of proceeding in another court; but it will scrutinize the conduct of the parties, and, if it finds that they have been guilty of fraud in obtaining a judgment or decree, it will deprive them of the benefit of it, and of any inequitable advantage which they have derived under it."

The decree of the court was reversed, with directions to overrule the demurrer.

Marshall v. Holmes, 141 U. S. 589, 12 Sup. Ct. 62, 35 L. Ed. 870, was a suit brought to enjoin the enforcement of certain judgments, on the ground that they had been obtained by false testimony, and by testimony as to the contents of a letter which plaintiff claimed either

never existed or was a forgery. Judgments had been obtained in the state court of Louisiana, and the bill to obtain relief from the judgments was also brought originally in the state court, and a preliminary injunction obtained. Thereafter plaintiff in the suit filed a petition and bond for removal to the federal court. The state court denied the removal, and proceeded to try the case, denying relief to the plaintiff, dissolving the preliminary injunction, and ordering judgment on the bond in favor of the defendant. The plaintiff appealed to the Supreme Court of Louisiana, where the appeal was dismissed for want of jurisdiction. The plaintiff then appealed to the state court of appeals of Louisiana, which affirmed, with certain modification, the judgment of the state district court. The plaintiff then prosecuted a writ of error to the Supreme Court of the United States. The court in its opinion said:

"After the filing of the petition for removal, accompanied by a sufficient bond, and alleging that the controversy was wholly between citizens of different states, the state court was without authority to proceed further if the suit, in its nature, is one of which the Circuit Court of the United States could rightfully take jurisdiction."

The court next held that a Circuit Court of the United States, in the exercise of its equity powers, and where diverse citizenship gives jurisdiction over the parties, may deprive the party of the benefit of a judgment fraudulently obtained by him in the state court if the circumstances are such as would authorize relief by a federal court, if, the judgment had been rendered by it, and not by a state court, as a decree to that effect does not operate upon the state court, but upon the party. In the course of its opinion the court used the following language (141 U. S. 596, 12 Sup. Ct. 64, 35 L. Ed. 870):

"It is the settled doctrine that 'any fact which clearly proves it to be against conscience to execute a judgment, and of which the injured party could not have availed himself in a court of law, or of which he might have availed himself at law, but was prevented by fraud or accident, unmixed with any fault or negligence in himself or his agents, will justify an application to a court of chancery,'" citing numerous cases, and among them the Throckmorton Case

The court further said:

"While the court, upon final hearing, would not permit Mrs. Marshall, being a party to the actions at law, to plead ignorance of the evidence introduced at the trial, it might be that relief could be granted by reason of the fact. distinctly alleged, that some of the necessary proof establishing the forgery of the letter was discovered after the judgments at law were rendered, and after the legal delays within which new trials could have been obtained, and could not have been discovered by her sooner. It was not, however, for the state court to disregard the right of removal upon the ground simply that the averments of the petition were insufficient or too vague to justify a court of equity in granting the relief asked. The suit being, in its general nature, one of which the circuit court of the United States could rightfully take cognizance, it was for that court, after the cause was docketed there, and upon final hearing, to determine whether, under the allegations and proof, a case was made which, according to the established principles of equity, entitled Mrs. Marshall to protection against the judgments alleged to have been fraudulently obtained."

The judgment of the state court was accordingly reversed, and the cause remanded, with directions that the state district court set aside all orders made after filing the petition and bond for removal.

There was at one time a question in the lower courts whether Marshall v. Holmes did not overrule or modify the Throckmorton Case, and the Circuit Court of Appeals of the Seventh Circuit attempted to certify a question, in the case of Graver v. Faurot, to the Supreme Court, for the purpose of having the apparent conflict determined. The Supreme Court, however, dismissed the certificate, on the ground that to answer the question was practically to pass upon the whole case. See Graver v. Faurot (C. C.) 64 Fed. 241; Id., 76 Fed. 257, 22 C. C. A. 156; Id., 162 U. S. 435, 16 Sup. Ct. 799, 40 L. Ed. 1030. As to the views of the Circuit Court of Appeals of the Second Circuit, see U. S. v. Gleeson, 90 Fed. 778, 33 C. C. A. 272.

That the Supreme Court of the United States does not regard the Marshall Case and the Throckmorton Case as being in conflict is shown by the fact that each of the cases has been followed with approval by that court in its subsequent decisions. As illustrations, see U. S. v. Beebe, 180 U. S. 343, 349, 21 Sup. Ct. 371, 45 L. Ed. 563; Greenameyer v. Coate, 212 U. S. 434, 29 Sup. Ct. 345, 53 L. Ed. 587; Simon v. Ry., 236 U. S. 115, 35 Sup. Ct. 255, 59 L. Ed. 492. And that the rules laid down in the Throckmorton Case have been followed by both federal and state courts repeatedly, see Nelson v. Meehan, 155 Fed. 1, 83 C. C. A. 597, 12 L. R. A. (N. S.) 374, where the Circuit Court of Appeals of the Ninth Circuit collects and reviews a large number of the cases, both state and federal.

The inquiry, therefore, remains, in the case at bar, whether the facts take it out of the rule announced in the Throckmorton Case.

In Hilton v. Guyot, 159 U. S. 113, 207, 16 Sup. Ct. 139, 160 (40 L. Ed. 95), a case involving primarily the question of the impeachment of a foreign judgment, the court in its opinion again announced the rule in the Throckmorton Case, but in slightly different language, as follows:

"It has often, indeed, been declared by this court that the fraud which entitles a party to impeach the judgment of one of our own tribunals must be fraud extrinsic to the matter tried in the cause, and not merely consist in false and fraudulent documents or testimony submitted to that tribunal, and the truth of which was contested before it and passed upon by it."

From the multitude of cases in which relief has been granted in equity against judgments at law on account of fraud, we cite a few as illustrative:

In the case of Graver v. Faurot, supra, the fraud which was attacked, and which was held sufficient to justify relief in equity, was the interposition of a false answer, under oath, in a suit in equity, which had caused the plaintiff to go no further with the suit, which had been dismissed at the instance of the defendant upon introducing the sworn answer in evidence.

In Lehman v. Graham, 135 Fed. 39, 67 C. C. A. 513, the fraud consisted in a conspiracy by which judgment had been taken against Graham on a note given by him as collateral, though he had theretofore paid the original debt in full.

In Pickens v. Merriam, 242 Fed. 363, 155 C. C. A. 139, the fraud consisted in deliberate omissions of assets from the inventory and accounts on the part of an administrator in a probate proceeding which had gone to final decree. The court in its opinion, after citing the Throckmorton Case, said:

"Because of the conduct of the defendants in concealing the facts concerning the estate, it appears that there has been no adversary trial or decision upon these issues; and we find nothing in the proceedings or decree of the superior court of Los Angeles county, as set up in the bill of complaint, to estop the complainants from having these matters inquired into, and the question of the alleged fraud determined by the court."

An interesting early case is that of Ocean Insurance Co. v. Fields, 2 Story, 59, Fed. Cas. No. 10406. That was a case where suit was brought to set aside a judgment obtained upon a policy of insurance on a ship, it being claimed that the judgment had been obtained by fraud. It appeared from the bill that the defense of fraud had been set up in the action at law, but it also appeared that the fraud set up and tried was fraud in "casting away the ship," where as the new fraud alleged in the bill was in "boring holes in her bottom," and it was alleged that the latter fraud was not known until after the judgment. Demurrer to the bill was overruled by Justice Story.

In Young v. Sigler (C. C.) 48 Fed. 182, the fraud consisted of a conspiracy by plaintiff and one of two joint trespassers against him, by which a judgment should be obtained for the benefit of both conspirators against the remaining joint trespasser. A settlement had been made by the plaintiff with one of the joint trespassers, and this had been concealed until after judgment had been obtained against the other.

In Daniels v. Benedict (C. C.) 50 Fed. 347, the fraud consisted in a conspiracy on the part of certain agents of the husband, Daniels, by which his wife was induced to agree to the entry of a decree of divorce, on the ground of desertion; but the decree, in fact, was obtained on the ground of adultery, testimony being introduced in the absence of the wife.

In Graves v. Graves, 132 Iowa, 199, 109 N. W. 707, 10 L. R. A. (N. S.) 216, 10 Ann. Cas. 1104, the fraud consisted in concealment of assets and false swearing in relation to property owned by the husband, in the trial of a divorce case.

In Nugent v. Railway, 46 App. Div. 105, 61 N. Y. Supp. 476, the fraud consisted in a conspiracy between plaintiff's attorney and certain witnesses, by which they were induced to commit perjury, in testifying that they were eyewitnesses to a certain accident resulting in a personal injury suit.

In Taylor v. Railroad, 86 Tenn. 228, 6 S. W. 393, the fraud consisted in suing and taking judgment a second time upon certain bonds which had already been put in judgment, but which had been thereafter stolen.

In Wonderly v. Lafayette County, 150 Mo. 635, 51 S. W. 745, 45 L. R. A. 386, 73 Am. St. Rep. 474, the fraud consisted in concealment of the real ownership of certain bonds, so that suit might be brought on

them in a federal court on the ground of diverse citizenship. The court in its opinion said:

"The scheme was a fraud on the court whose jurisdiction was betrayed, and a fraud on the defendant who was tricked out of its defense. True, the statement in the petition in that suit that Owings, a citizen of Illinois, was the owner of the bonds, is a statement which, under fair conditions, might have been traversed, and the plaintiff put to his proof. But there were no such fair conditions there. The fact that that statement was false was known only to the plaintiff and Owings and they concealed it for the purpose of preventing defendant from making that defense. Not only was the true ownership of the bonds known to them, but the false appearance of ownership was a fact of their own creation, concocted for the purpose of deceiving the court into entertaining a case which, if the truth appeared, it would have rejected on the ground that it had no jurisdiction."

The cases cited by defendant wherein relief was denied which have not already been reviewed are the following:

Pico v. Cohn, 91 Cal. 129, 25 Pac. 970, 27 Pac. 537, 13 L. R. A. 336, 25 Am. St. Rep. 159, which was a case where the fraud complained of was perjury pure and simple. The Throckmorton Case was cited and followed.

Hudgens v. Baugh (D. C.) 225 Fed. 899, was a case where the fraud attacked was not between the plaintiff and defendant in the bill, but a fraud practiced on the plaintiff by a third party. The court said:

"It is not alleged nor suggested that the defendant in this action, the plaintiff in the action at law, practiced any fraud on the complainants, whereby they were prevented from making a full defense."

In Ross v. Wood, 70 N. Y. 8, 12, the fraud attacked was perjury simply. The court in its opinion said:

"There was no suppression of evidence by the plaintiff in the former action, or ignorance on the part of the present plaintiff of any fact material to the controversy, and all the evidence which is now within his reach was produced or might have been produced on that trial, and was equally competent then as now."

In Mayor v. Brady, 115 N. Y. 599, 608, 22 N. E. 237, 239, the fraud attacked was thus described by the court in its opinion:

"The entire grievance of the plaintiff, when reduced to its simplest form of statement, consists of a complaint that its own surveyor has classified certain excavations as earth, which should have been described as rock, and the measure of the relief demanded is that the court make a classification which the contract requires the surveyor to make."

And again (115 N. Y. 618, 22 N. E. 243):

"The plaintiff must be considered negligent in not discovering and availing itself of its defense, upon the trial of the action, resulting in the judgments referred to."

In Railway Co. v. Ingram, 85 Ill. 172, a bill was filed in equity for a new trial at law, on grounds of false and fraudulent testimony, and that evidence to that effect had been discovered since the trial. The bill was dismissed because it was not accompanied by affidavits of witnesses by whom the new evidence would be given.

In Railroad v. Mirrielees, 182 Mo. 126, 81 S. W. 437, the fraud at-

tacked was perjury by the plaintiff in the law action. The court in its opinion said:

"The only fraud propounded or suggested is this alleged false testimony given by the then plaintiff in the case. * * * There is no averment of any artifice, trick, promise, or fraudulent conduct of the said plaintiff whereby the company was in any manner deceived or lulled into security or by any means prevented from obtaining testimony to rebut the said evidence of plaintiff."

In Hamilton v. McLean, 139 Mo. 678, 688, 41 S. W. 224, 226, the fraud attacked was false testimony and a forged deed introduced in the action at law, and the case was held to be within the rule in the Throckmorton Case, the court adding, as to the perjury:

"It does not appear * * * that plaintiff was prevented by any interposition of defendants from showing that fact, if true, in the partition suit."

Hamilton v. McLean, 169 Mo. 51, 68 S. W. 930, was a second suit between the same parties, on the same cause of action as in 139 Mo. The result was the same.

The facts in the case at bar have been already stated, and the question arises wherein lay the fraud. Was it simply in the false testimony at the time of the trial that plaintiff was permanently paralyzed? By no means. The fraud consisted also in a concocted history of the case, to wit, that plaintiff a few days after the accident became paralyzed, and remained so continuously thereafter up to the time of the trial, a period of more than six months. The continuance of the paralysis for a period of more than six months was one of the most important factors on which all of the medical men, both for plaintiff and defendant, based their conclusions. We may disregard the question whether at the several times of the examinations of plaintiff he was artificially paralyzed by drugs or feigned paralysis through self-control. We may even assume that he had true paralysis on these several occasions if possible, but the fact remains that in the intervals he had the use of his legs, and had been seen and known to use them on many occasions. Yet this true history of the case was, by a conspiracy, concealed from the defendant; the false history of the case was given to the various doctors for the defendant, and even to one of the plaintiff's own doctors, either by the plaintiff himself or by another of his doctors. On this false and fraudulent foundation these medical experts rested their conclusions. In other words, they were induced by trickery to testify directly opposite to what they would undoubtedly have testified had they known the truth. The jury was deceived; the court was deceived; the witnesses many of them were deceived—all by this conspiracy and fraud, a fraud consisting not merely in the testimony of plaintiff on the trial, but also in this concocted plan outside of court, pursuant to which a false history of the case was made up and proclaimed. By this fraud the witnesses for defendant, and one at least of the witnesses for the plaintiff, were led to give entirely different testimony from what they would have given but for this fraud. The examination tests on the plaintiff himself and the history of the case were the two main factors on which the experts rested their conclusions. Had these experts been caused to

make tests on a real paralytic fraudulently substituted in place of plaintiff, no one would hesitate to say that the fraud was extrinsic and collateral; yet to substitute a false history of the case in place of the true one, by deception and conspiracy, was equally an extrinsic and collateral fraud, and did "not merely consist in false and fraudulent documents or testimony submitted to the tribunal and the truth of which was contested before it and passed upon by it," as the rule was stated in the case of Hilton v. Guyot, supra. In our judgment the facts take the case out of the rule announced in the Throckmorton Case and restated in the Hilton Case.

All of the elements essential to a good cause of action in equity are present in the case. In National Surety Co. v. State Bank, 120 Fed. 593, 56 C. C. A. 657, 61 L. R. A. 394, this court stated those elements as follows:

"The indispensable elements of such a cause of action are: (1) A judgment which ought not, in equity and good conscience, to be enforced; (2) a good defense to the alleged cause of action on which the judgment is founded; (3) fraud, accident, or mistake which prevented the defendant in the judgment from obtaining the benefit of his defense; (4) the absence of fault or negligence on the part of the defendant; (5) the absence of any adequate remedy at law."

As to the last element, it is to be noted that at the time of the trial in the court below appeals were pending in the Supreme Court of Missouri from the original judgment, and also from the order denying the writ of error coram nobis. This condition of affairs—the possibility that the plaintiff company might obtain relief at law in the state court in the original case—apparently had considerable influence, and properly so, in causing the trial court to deny relief in the present suit. But the remedy at law has now been exhausted and yet the merits of the company's application for relief have not been passed upon in the state courts, the Supreme Court of Missouri holding (Callicotte v. R. R., 204 S. W. 528; Id., 274 Mo. 689, 204 S. W. 529) that the lower court had no jurisdiction to entertain a motion for a writ of error coram nobis after the term and while an appeal from the original judgment was pending in the Supreme Court; and holding, further, that, on the appeal from the judgment, relief from the alleged fraud could not be granted in the Supreme Court because that court was restricted to the record in the case as made at the trial. One of the judges in concurring stated that he did so on the ground that relief in equity was not precluded by their decision. Relief in the present equitable suit is, we conclude, not barred by the proceedings in the state courts.

[2] 3. That the judgment against which relief is sought was rendered in the state court is not material. In cases of this character the injunction acts not on the court rendering the judgment, but on the party. Arrowsmith v. Gleason, 129 U. S. 86, 9 Sup. Ct. 237, 32 L. Ed. 630; Marshall v. Holmes, 141 U. S. 589, 12 Sup. Ct. 62, 35 L. Ed. 870; McDaniel v. Traylor, 196 U. S. 415, 25 Sup. Ct. 369, 49 L. Ed. 533; Simon v. Railway, 236 U. S. 115, 35 Sup. Ct. 255, 59 L. Ed. 492; Graver v. Faurot, 76 Fed. 257, 22 C. C. A. 156; Nat. Surety Co. v. State Bank, 120 Fed. 593, 56 C. C. A. 657, 61 L. R. A. 394; Lehman

v. Graham, 135 Fed. 39, 67 C. C. A. 513; Union Ry. Co. v. Ill. Cent. Ry., 207 Fed. 745, 125 C. C. A. 283; N. W. Port Huron Co. v. Babcock, 223 Fed. 479, 139 C. C. A. 27.

Decree dismissing the bill is reversed, with instructions to grant the injunctive relief prayed for.