34 C.C.P.A.(Patents)

## JOSSERAND v. TAYLOR.

Patent Appeal No. 4745.

Court of Customs and Patent Appeals.

Nov. 4, 1946.

Lester B. Clark, of Houston, Tex., for appellant.

Leonard L. Kalish, of Philadelphia, Pa. (Paul & Paul, of Philadelphia, Pa., of counsel), for appellee.

Before GARRETT, Presiding Judge, and BLAND, HATFIELD, JACKSON. and O'CONNELL, Associate Judges.

HATFIELD, Associate Judge.

This is a petition by appellee (Taylor) to reopen the interference between the parties Louis P. Josserand and Samuel Herbert Taylor, Jr., 138 F.2d 58, 31 C.C.P.A. (Patents) 709, in this court, or for leave to apply to the proper tribunal of the Patent Office to reopen it, or that the court authorize the proper Patent Office tribunal to reopen it, and that the court grant such other relief as it may deem proper.

The petition, although not so denominated, is in effect a bill of review or an application for leave to file a bill of review in the Patent Office, it being claimed that the party Josserand perpetrated a fraud upon this court in the interference proceeding

in which priority of the invention, defined by the count in issue, was awarded to him.

It is the contention of counsel for appellee that the party Josserand, in a public-use proceeding, "confessed fraud in inducing and obtaining the award-of-priority" and repudiated his testimony and that of his witnesses in the interference proceeding "upon which [testimony] he fraudulently induced this court's award-of-priority to him." It is further contended that Josserand and his witnesses who testified that the elements called for by the count were present in the Galveston theater, committed perjury; that Josserand had nothing whatsoever to do with the Galveston drive-in theater but "merely assimilated or 'annexed' this 1934-Galveston drive-in theater for his purposes in the interference, seven years after the event, by adroitly manufactured evidence; as part of his scheme to steal an invention about which he knew nothing until it was disclosed to him by Taylor's licensee, W. W. Smith and by Taylor's sub-licensee, Robert E. Power, in Los Angeles on October 21, 1939 (one week before Josserand filed his application-in-interference)." It is alleged, also, in appellee's petition that Josserand's confession of fraud is disclosed in his answer in the public-use proceedings, his brief filed therein, and his testimony and that of his witnesses; that it appears therefrom that the theater constructed on the beach at Galveston was merely an experiment; that it was not completed; that the construction was not a reduction to practice of the drive-in theater defined by the count in interference; that in his testimony appellee stated among other things that "The theater itself was a whole lot more on paper and testimony than it ever was on the sands of the beach of Galveston at that time. Verbally it appears to much better advantage than it did on the beach"; and that in Josserand's brief it is stated that "*Each,* Mrs. Howard, Josserand and Emenhiser *testified as to the experimental nature of the theater and its operation, and their testimony is* not *consistent with the testimony of the interference record.*" (It may be stated at this point that in the oral argument in this court, counsel for appellant stated that the word *"not"* in the foregoing quotation was a typographical error and that he had no intention of stating that the evidence in the public-use proceeding was inconsistent with the evidence in the interference.)

It is further stated in appellee's petition that, because of the repudiation by Josserand of his testimony and that of his witnesses in the interference case, appellee Taylor "had no alternative but to examine a sufficiently large number of disinterested and reputable persons of recognized standing in their community (Galveston) who had either had actual connection with the 1934-Galveston drive-in theater or had personally observed its construction and structure so as to resolve, beyond peradventure," that although there was a public use of a drive-in theater, there were no inclined drive-over ramps or inclined parking ramps in appellant's drive-in theater as called for by the count involved in the interference; but that on the contrary, the car-parking area in the 1934 Galveston drive-in theater "was nothing more than flat beach surface with the natural down-incline towards the water's edge."

The count in the interference reads:

"In a drive-in theater a plurality of inclined parking ramps for elevating the front ends of automobiles parked in said theater, a plurality of inclined drive-over ramps merging with the higher portions of said parking ramps, and a plurality of driveways, each of said driveways merging with the lower portion of one of said drive-over ramps on one side thereof and with the lower portion of one of said parking ramps on the other side thereof."

It is true that in his testimony in the public-use proceeding, appellant Josserand stated "The theater itself was a whole lot more on paper and testimony than it ever was on the sands of the beach of Galveston at that time" and that "Verbally it appears to much better advantage than it did on the beach." Nevertheless, appellant stated over and over again in his testimony that the invention defined by the quoted count was constructed on the beach at Galveston, and each of his witnesses who testified in that proceeding corroborated his testimony in that regard.

It is also true that appellant and each of his witnesses in the public-use proceeding testified that the theater was not completed at the time of its destruction by a storm (the destruction of which was explained in our decision in the interference proceeding) and that the operation of his drive-in theater was experimental in character. It is apparent from the record that in testifying that the theater was not complete at the time of its destruction, each of the witnesses intended to be understood as saying that the drive-over ramps and other elements of the invention, as defined by the count in issue, were not extended to cover the complete area of the theater grounds.

So far as the experimental nature of the Galveston drive-in theater is concerned, it may be stated that prior to the construction of that theater, the party Josserand and the witness A. H. Emenhiser, who was in charge of the construction, had attempted to lease some property from the witness T. D. Dunn, Jr., of Houston, Texas, for the purpose of constructing a drive-in theater thereon; that the witness Dunn was somewhat skeptical of the success of such a theater; and that for that reason, and because of the comparative difference in the cost of constructing a temporary theater on the beach and a permanent structure on the Dunn property, it was decided that a so-called "experimental theater" should be constructed on the beach at Galveston. (It appears that it would cost approximately $1,500 to construct a temporary drive-in theater on the beach, whereas the cost of constructing a permanent one on the property of Mr. Dunn would be approximately $30,000.)

The features of the Josserand theater, which have been referred to as experimental, were, namely, (1) to determine whether the public would be interested in a drive-in theater, and (2) to build the necessary driveways, inclined parking ramps, and inclined drive-over ramps, as called for by the count in interference, so that all persons seated in automobiles located in all parts of the theater could, without difficulty, see the picture being shown. It may be said in this connection that in his preliminary statement in the interference proceeding the party Josserand referred to the fact that he had experimented with the so-called Galveston drive-in theater, and the court referred to that fact in its decision.

Obviously, no one would seriously contend that a *permanent* theater, having inclined parking ramps for elevating the front ends of automobiles, together with the other elements called for by the count in the interference, would be constructed by any sensible person on the sands of a beach. Nevertheless, it appeared from the evidence in the interference proceeding and from the testimony of the party Josserand and his witnesses in the public-use proceeding that a drive-in theater, conforming to the count in issue, was constructed and successfully, although temporarily, operated on the beach at Galveston.

In order to establish that the party Josserand's drive-in theater at Galveston was not constructed in conformity with the count in the interference, and that appellant and his witnesses perpetrated a fraud upon this court by committing perjury in that proceeding, appellee introduced in the public-use proceeding the testimony of approximately fifteen witnesses. Many of those witnesses, who were interrogated regarding the elements called for by the count involved in the interference and who testified some ten years subsequent to the construction of the theater in question, stated that there were no inclined parking ramps, as called for by the count, or that they did not see such inclined parking ramps in the theater. So far as appears from the record, all of those witnesses were available and could have been called to testify in the interference proceeding. Why they were not called is not explained.

The presence of the elements called for by the count in issue in appellant's drive-in theater on the beach at Galveston, Texas, and the reduction to practice of the invention, were fully tried and decided by this court, at a former term, in our decision in the interference proceeding, in which proceeding the sufficiency of the evidence and the credibility of appellant's witnesses were fully considered and determined.

■ It has repeatedly been held by the Supreme Court and by the Circuit Courts

of Appeals that relief may be obtained in equity by a bill of review only in the event that a final judgment or decree rendered at a former term by a court having jurisdiction of the issues presented, was obtained by fraud, extrinsic or collateral to the issues tried and finally determined. United States v. Throckmorton, 98 U.S. 61, 25 L.Ed. 93; Vance v. Burbank, 101 U.S. 514, 25 L.Ed. 929; Hilton v. Guyot, 159 U.S. 113, 207, 16 S.Ct. 139, 40 L.Ed. 95; United States v. Beebe, 180 U.S. 343, 21 S.Ct. 371, 45 L.Ed. 563; Greenameyer v. Coate, 212 U.S. 434, 444, 29 S.Ct. 345, 53 L.Ed. 587; United States v. Atkins, 260 U.S. 220, 224, 43 S.Ct. 78, 67 L.Ed. 224; Toledo Scale Co. v. Computing Scale Co., 261 U.S. 399, 421–425, 43 S.Ct. 458, 67 L.Ed. 719; United States v. Gleeson, 2 Cir., 90 F. 778; Nelson v. Meehan, 9 Cir., 155 F. 1, 12 L.R.A.,N.S., 374; Pickens v. Merriam, 9 Cir., 242 F. 363; Chicago, R. I. & P. Ry. Co. v. Callicotte, 8 Cir., 267 F. 799, 16 A.L.R. 386; United States v. Atkins, 8 Cir., 268 F. 923–930 and Raymond et al. v. Wickersham, 129 F.2d 522, 29 C.C.P.A. (Patents) 1166, and cases therein cited and reviewed.

In the Throckmorton case, the Supreme Court, after considering various decisions, stated that:

"We think these decisions establish the doctrine on which we decide the present case; namely, that the acts for which a court of equity will on account of fraud set aside or annul a judgment or decree, between the same parties, rendered by a court of competent jurisdiction, *have relation to frauds, extrinsic or collateral, to the matter tried by the first court, and not to a fraud in the matter on which the decree was rendered.* (Italics not quoted)

"That the mischief of retrying every case in which the judgment or decree rendered on false testimony, given by perjured witnesses, or on contracts or documents whose genuineness or validity was in issue, and which are afterwards ascertained to be forged or fraudulent, would be greater, by reason of the endless nature of the strife, than any compensation arising from doing justice in individual cases."

It is clear from the cited decisions that unless there is at least some evidence of record tending to establish that the decision of this court in the interference case was obtained by fraud, extrinsic or collateral to the issues tried and finally determined in that case, appellee is not entitled to the relief prayed for in his petition. If there is such evidence of record, the testimony of appellee's witnesses regarding the issue determined in the interference proceeding that the elements of the count in interference were present in appellant's Galveston drive-in theater, is wholly unnecessary. On the contrary, if there is no such evidence, the testimony of appellee's witnesses in that regard is wholly irrelevant to the issues presented.

It may be pointed out, as a matter of some interest, that although the witnesses Joseph Townsend, Sr., Richard Townsend, Ted Townsend, and John Harris who testified on behalf of the party Josserand in the interference proceeding, and who either had charge of constructing the drive-over ramps and the other elements called for by the count in interference, or of maintaining those elements, were subpoenaed in the so-called public-use proceeding by counsel for appellee, they were not called as witnesses. It is fair to assume, therefore, that their testimony as to the construction of the Galveston drive-in theater would not have been satisfactory to the position taken by counsel for appellee, who undoubtedly, at the time those witnesses were subpoenaed, had in mind the filing of a petition to reopen the interference case on the ground of alleged fraud in the presentation of Josserand's case. The testimony of those witnesses has been fully outlined in our decision in the interference proceeding and need not be repeated here.

The question of originality was raised by counsel for appellee in the public-use proceeding, and is relied upon here as one of the grounds in appellee's bill of review or petition for leave to file a bill of review in the Patent Office. That issue was also raised in the interference proceeding, and although not discussed in our de-

cision in that case, it was, however, decided adversely to appellee, the court holding that appellant was the first to conceive the invention and the first to reduce it to practice. The same issue was raised in appellee's petition for rehearing which was denied by the court without opinion. Owing to the fact that that issue was disposed of in the interference proceeding by the final decision of this court, it can not now be properly considered in a bill of review or in a petition for leave to file a bill of review, unless there is some evidence in the record now before us of fraud, extrinsic or collateral to the issues finally decided in the interference proceeding. See cases hereinbefore cited.

It is contended here by counsel for appellee that the rule relative to extrinsic or collateral fraud, announced by the Supreme Court in the case of United States v. Throckmorton, hereinbefore set forth, and reaffirmed by that court in Vance v. Burbank, Hilton v. Guyot, United States v. Beebe, United States v. Atkins and Toledo Scale Co. v. Computing Scale Co., supra, and followed by the Circuit Courts of Appeals in the cases hereinbefore cited, has been repudiated by the Supreme Court in the cases of Hazel-Atlas Glass Co. v. Hartford-Empire Co., 322 U.S. 238, 64 S.Ct. 997, 88 L.Ed. 1250, Precision Instrument Mfg. Co. v. Automotive Maintenance Machinery Co., 324 U.S. 806, 65 S.Ct. 993, 89 L.Ed. 1381, Universal Oil Products Co. v. Root Refining Co., 66 S.Ct. 1176, and Knauer v. United States, 66 S.Ct. 1304.

Counsel for appellee relies chiefly upon the decision in the Hazel-Atlas Glass Co. case, and argues that the Supreme Court there held that it was the duty of a federal court to nullify a judgment or decree rendered at a former term, obtained by *either* *extrinsic* or *intrinsic* fraud, and that, therefore, the evidence introduced by appellee in the public-use proceeding, relative to the existence in appellant's Galveston drive-in theater of the elements of the count involved in the interference, as well as that pertaining to the issue of originality, is properly before this court in this proceeding.

We are unable to concur in the views expressed by counsel for appellee that it was the intention of the Supreme Court in the Hazel-Atlas Glass Co. case, supra, to overrule the decisions of that court and those of the Circuit Courts of Appeals, hereinbefore cited, and to hold that a judgment or decree rendered by a federal court at a former term, obtained by *intrinsic* fraud as distinguished from *extrinsic* or *collateral* fraud, should be nullified in a proceeding such as here involved. No mention was made in the court's opinion of the terms "extrinsic" or "intrinsic" fraud. Furthermore, we think it is clear from the decision in that case that the court was of opinion that the fraud therein referred to was extrinsic or collateral to the issues finally determined by the Circuit Court of Appeals in that case.

In its decision relative to the facts before it, the court stated [322 U.S. 238, 64 S.Ct. 998]:

"In 1926 Hartford had pending an application for a patent on a machine which utilized a method of pouring glass into molds known as 'gob feeding.' The application, according to the Circuit Court, 'was confronted with apparently insurmountable Patent Office opposition.' To help along the application, certain officials and attorneys of Hartford determined to have published in a trade journal an article signed by an ostensibly disinterested expert which would describe the 'gob feeding' device as a remarkable advance in the art of fashioning glass by machine. Accordingly these officials prepared an article entitled 'Introduction of Automatic Glass Working Machinery; How Received by Organized Labor', which referred to 'gob feeding' as one of the two 'revolutionary devices' with which workmen skilled in bottle-blowing had been confronted since they had organized. After unsuccessfully attempting to persuade the President of the Bottle Blowers' Association to sign this article, the Hartford officials, together with other persons called to their aid, procured the signature of one William P. Clarke, widely known as National President of the Flint Glass Workers' Union. Subsequently, in July 1926, the article was published in the National Glass Budget, and in October 1926 it was introduced as part of the record in support of the pending applica-

tion in the Patent Office. January 3, 1928, the Patent Office granted the application as Patent No. 1,655,391."

The court, in discussing the issues, further stated that:

"Every element of the fraud here disclosed demands the exercise of the historic power of equity to set aside fraudulently begotten judgments. *This is not simply a case of a judgment obtained with the aid of a witness who, on the basis of after-discovered evidence, is believed possibly to have been guilty of perjury.* Here, even if we consider nothing but Hartford's sworn admissions, *we find a deliberately planned and carefully executed scheme to defraud not only the Patent Office but the Circuit Court of Appeals.* Cf. Marshall v. Holmes, supra. Proof of the scheme, and of its complete success up to date, is conclusive. Cf. United States v. Throckmorton, supra." (Italics not quoted)

It will be observed that in referring in its decision to its finding that "a deliberately planned and carefully executed scheme [that is, a conspiracy entered into and carried out by certain officials and attorneys of the Hartford Company] to defraud not only the Patent Office but the Circuit Court of Appeals," the court cited the case of Marshall v. Holmes, 141 U.S. 589, 12 S.Ct. 62, 35 L.Ed. 870, and that in its reference to the "Proof of the scheme, and of its complete success up to date, is conclusive" it cited the case of United States v. Throckmorton, supra.

The court also stated in its opinion:

"Out of deference to the deep-rooted policy in favor of the repose of judgments entered during past terms, courts of equity have been cautious in exercising their power over such judgments. United States v. Throckmorton, 98 U.S. 61, 25 L.Ed. 93. But where the occasion has demanded, where enforcement of the judgment is 'manifestly unconscionable.' Pickford v. Talbott, 225 U.S. 651, 657, 32 S.Ct. 687, 56 L.Ed. 1240,

they have wielded the power without hesitation." [1]

It is the last sentence in that quoted excerpt, together with the cases referred to in the foot-note, that apparently has caused some confusion as to what the court intended to be understood as holding in that case.

There is nothing in any of the cases cited by the court in the foot-note to indicate that the court intended to abrogate the rule relative to extrinsic or collateral fraud announced in the case of United States v. Throckmorton, supra, and followed by the Supreme Court and Circuit Courts of Appeals in the cases hereinbefore cited.

It may be observed that in the case of Publicker v. Shallcross, 3rd 106 F.2d 949, 951, 126 A.L.R. 386, cited in the foot-note in the Hazel-Atlas Glass Co. case, supra, the Circuit Court of Appeals, Third Circuit stated that there was a conflict between the decision in the case of Marshall v. Holmes, supra, and the decision in the case of United States v. Throckmorton, supra, and that the conflict between those decisions "has been a source of bewilderment to the 'inferior' Federal Courts ever since 1891." Furthermore, in that decision the court quoted at length from 22 Harvard Law Review 600 and 49 Harvard Law Review 327 and from 21 Columbia Law Review 268. In the quoted excerpt from the Columbia Law Review, it is stated that there is an irreconcilable conflict between the Supreme Court decisions and other federal court decisions, in some of which it is held that fraud may consist of perjured testimony, whereas other decisions hold that only extrinsic or collateral fraud may be considered in a bill of review.

According to the decision in the Publicker case, supra, it is stated, in the cited Columbia Law Review, among other things, that:

" * * * The Supreme Court of the United States, to show its utter impartial-

[1] See, e. g., Art Metal Works v. Abraham & Strauss, 2 Cir., 107 F.2d 940 and 944; Publicker v. Shallcross, 3 Cir., 106 F.2d 949, 126 A.L.R. 386; Chicago, R. I. & P. Ry. Co. v. Callicotte, 8 Cir., 267 F. 799, 16 A.L.R. 386; Pickens v. Merriam, 9 Cir., 242 F. 363; Lehman v. Graham, 5 Cir., 135 F. 39; Bolden v. Sloss-Sheffield Steel & Iron Co., 215 Ala. 334, 110 So. 574, 49 A.L.R. 1206. For a collection of early cases see Note (1880) 20 Am.Dec. 160.

ity, has ruled both ways, and left the spectacle of two cases, one of which holds that false evidence is a ground for reversal, the other that it is not, both of which have been followed, and neither of which has ever been overruled. * * * 'As for the federal rule itself, it must still remain unsettled. Since the courts are at liberty to cite either line of authorities, and do so as suits their convenience, the only possible answer in spite of repeated assertions that the federal rule is clear, is that there is no federal rule at all. And there will be none until one or the other of the conflicting decisions is overruled."

The court further stated in that decision that:

"In our judgment, and if the case arises, the harsh rule of United States v. Throckmorton, above cited, will be modified in accordance with the more salutary doctrine of Marshall v. Holmes, above cited."

In the case of Chicago, R. I. & P. Ry. Co. v. Callicotte, supra, cited in the foot-note in the Supreme Court's opinion of Hazel-Atlas Glass Co. case, the Circuit Court of Appeals, Eighth Circuit, stated that there was no conflict between the decisions in the case of Marshall v. Holmes and the case of United States v. Throckmorton, and that the rule announced in the Throckmorton case, as to the character of fraud required to support a bill of review, was still in full force and effect.

It will be observed that in the Publicker case, supra, the Supreme Court's attention was directly called to the fact that some of the Circuit Courts of Appeals had held that there was a conflict between the decisions in the cases of Marshall v. Holmes, supra, and United States v. Throckmorton, supra. Nevertheless, in the Hazel-Atlas Glass Co. case, supra, no reference is made to any conflict between those decisions and both are cited with approval. It is stated, in the dissenting opinion in that case, that the fraud was extrinsic and was, therefore, a proper matter for consideration in a bill of review.

It would seem to be clear that if the majority of the Supreme Court, in the Hazel-Atlas Glass Co. case, had been of opinion that the fraud there held to have

been perpetrated was intrinsic, and that there was a conflict between the decision in the Marshall v. Holmes and United States v. Throckmorton cases, supra, particularly in view of the circumstances hereinbefore related, it would have said so and would have expressly repudiated the rule announced in the Throckmorton case and followed by the Supreme Court and the Circuit Courts of Appeals in the cases hereinbefore cited. (In this connection it may be stated that although the case of Marshall v. Holmes was decided in 1891, many decisions of the Supreme Court, hereinbefore cited, reaffirming the rule in the Throckmorton case, were handed down long since the decision in the Marshall v. Holmes case. Accordingly, it is unnecessary for us to discuss the holding of the Supreme Court in that case.)

We think it is evident from the decision of the Supreme Court in the Hazel-Atlas Glass Co. case that the court was of opinion that "certain officials and attorneys" of the Hartford Company had entered into and carried out a conspiracy to defraud the Patent Office and the Circuit Court of Appeals, and that such a conspiracy was not an intrinsic but an extrinsic or collateral fraud.

It would seem, from the majority and the dissenting opinions in the Hazel-Atlas Glass Co. case, that the real difference of opinion was not as to the character of the fraud held to have been perpetrated but rather whether the question of fraud should have been finally decided by the Circuit Court of Appeals, as held by the majority of the court, or whether, as held by the minority, the Circuit Court of Appeals should have entered an order permitting the filing of a bill of review in the District Court. In its decision, the majority of the court stated, among other things, that it was unnecessary to decide "whether, if the facts relating to the fraud were in dispute and difficult of ascertainment, the Circuit Court here should have held hearings and decided the case or should have sent it to the District Court for decision."

In the Precision Instrument Mfg. Co. case, supra [324 U.S. 806, 65 S.Ct. 994], which was a suit involving the alleged in-

fringement of a patent, counsel for appellant relies upon a statement in that case wherein the Supreme Court stated in substance that it is the duty of an applicant for a patent, or those who are parties to "Patent Office proceedings," to report all facts, as stated in the headnotes, relating to "possible fraud or inequitableness underlying the application in issue."

The decision in the Universal Oil Products Co. case, supra [66 S.Ct. 1179], has no bearing whatsoever on the issues presented in the instant case. The decision in that case merely makes the broad statement that a Federal court has the inherent power "to investigate whether a judgment was obtained by fraud," and in support of that statement, cites the Hazel-Atlas Glass Co. case, supra.

In the case of Knauer v. United States [66 S.Ct. 1306], the Supreme Court had before it the question whether a certificate of naturalization could be set aside by a false and fraudulent representation in the petition that the person seeking naturalization "was attached to the principles of the Constitution" and "had taken a false oath of allegiance." In that case the Supreme Court made the statement, citing the Hazel-Atlas Glass Co. case, that it had "recently considered the broad powers of equity to set aside a decree for fraud practiced on the court which granted it." The Court, however, held that it was unnecessary to "consider in this case what the historic powers of equity might be in this situation." The reason for that was, as stated by the court, that the Congress had provided by statute that "false swearing" was such a fraud as warrants a federal court cancelling a certificate of naturalization. The court there very significantly pointed out that although "the making of a false oath be called intrinsic fraud (see United States v. Throckmorton, supra), it is within the reach of the statute."

Evidently the court in the Knauer case, although citing the Hazel-Atlas Glass Co. case, as hereinbefore noted, did not consider that the decision in the latter case was intended to repudiate the decision in the Throckmorton case, holding that a final judgment or decree, rendered at a former term by a court having jurisdiction of the issues presented, could be set aside by fraud other than that which was extrinsic or collateral to the issues tried and finally determined.

■■ We have given most careful consideration to the issues presented by counsel for appellee, in view of the seriousness of the charges presented, but are of opinion that the record before us wholly fails to establish that appellant Josserand either "confessed" or "virtually confessed" that he committed a fraud on this court, or that he repudiated his testimony or that of his witnesses in the interference proceeding or that any fraud was committed by appellant Josserand as to any material issue in that proceeding. In so holding we are not unmindful of the rule that, if the court had any serious doubt as to whether appellant Josserand perpetrated a fraud, extrinsic or collateral to the issues determined in the interference case, or if the question of such fraud was difficult of ascertainment, it would be the duty of the court to grant appellee's application for leave to file a bill of review in the Patent Office.

It should be understood that the issue of public use by the party Josserand of the invention defined by the count involved in the interference was not before us in the interference case, nor is it present in the instant proceeding, and that nothing that the court has stated in either decision should be considered as an expression of opinion of its views in regard to that issue.

For the reasons stated, the petition is denied.