PHYLLIS LUCILLE VILLALON, Also Known as GERAL PHYLLIS KNOX, Appellant *v.* GRANT L. BOWEN, as Special Administrator of the Estate of CHARLES BENJAMIN KNOX, Deceased, Respondent.

No. 3778

August 6, 1954.                                           273 P.2d 409.

*McCarran, Rice, Wedge and Blakey,* of Reno, for Appellant.

*John S. Sinai, John W. Coulman,* and *David P. Sinai,* of Reno, for Respondent.

458

## OPINION

By the Court, MERRILL, J.:

This is an appeal from judgment impressing a trust upon assets in the hands of appellant, which assets had, prior to distribution, constituted the estate of appellant's deceased husband. The essential question involved is this: the probate court having distributed the estate to appellant as widow of the deceased, did the court below in this independent suit err in decreeing that appellant in fact was not decedent's widow; that she had wrongfully concealed this fact from the court and from those entitled to know and had thus fraudulently advanced her claim to the estate; that equity should intervene to prevent her from enjoying the fruits of her fraud by impressing upon the estate distributed to her a trust in favor of those entitled to it under the will of decedent?

In 1946 appellant was married to Charles Benjamin Knox in Virginia City, Nevada. In 1949 she commenced a suit for divorce in Washoe County, Nevada. While that suit was pending Knox died. Three days later, August 17, appellant, under the name of Geral Phyllis Knox, filed her petition for letters of administration of the Knox estate.

Knox had left a will executed in 1941 naming one

Renwick Thompson of San Diego, California, as executor. On September 4, 1949 Thompson filed a petition for probate of the will. Appellant promptly filed objections to probate upon the ground that the will had been executed prior to her marriage to Knox and thus had been revoked by operation of law. She then went to San Diego and conferred with Thompson, representing herself to be Knox's widow and sole heir at law. She prevailed upon Thompson to file a renunciation of his right to act as executor.

Appellant, without opposition, was duly appointed administratrix and proceeded to administration of the estate. In June, 1950 the probate court ordered distribution to her of the entire estate.

In March, 1951 information was received by Thompson which, upon investigation, brought to light facts casting doubt upon the validity of appellant's marriage to Knox. It was discovered that in 1933 appellant, under her true maiden name of Phyllis Lucille Names, had been married to one Domingo Villalon, a native of the Philippine Islands.

Upon representation to the probate court that the estate possessed a possible equitable interest in the distributed assets, respondent Bowen was appointed special administrator. He thereupon brought this action against appellant to recover the assets distributed to her. He contended that the Villalon marriage had still been in effect at the time of the Knox ceremony; that the Knox marriage was thus rendered null and void under Nevada law. He contended that these facts had been known to appellant at the time she had secured Thompson's renunciation and her own appointment as administratrix and distribution of the estate to her and that she had been guilty of fraud.

On August 28, 1953, after trial without jury, judgment was rendered in favor of respondent, holding appellant to be trustee of the estate distributed to her by the probate court and directing that the trust estate

be delivered over to respondent. From that judgment appellant has taken this appeal.

This factual outline will be amplified as appellant's various assignments of error are discussed. These we shall discuss in six divisions.

*First:* Appellant contends that her marriage to Villalon had been terminated prior to her marriage to Knox by virtue òf Villalon's "civil death."

In 1935 in Oregon, Villalon had been convicted of second-degree murder and sentenced to life imprisonment in the state penitentiary. Oregon law (sec. 23–1407, Oregon Compiled Laws Annotated) provides: "A person sentenced to imprisonment in the penitentiary for life is thereafter deemed civilly dead." Our question, therefore, is as to the effect of civil death in Oregon so far as concerns a pre-existing marriage.

Oregon law is silent upon the question. Decisions of courts of other states are rare. Appellant directs our attention to certain authority exemplified by the cases collected in annotation, 139 A.L.R. 1323. In these cases, however, the civil death statute was supported by statutes relating to marriage or divorce and could not be said in and of itself to have caused termination of the marital status. The only case cited which appears squarely in point is Graham v. Graham, 251 Ala. 124, 36 S.2d 316, 319. The court was there faced with a civil death statute and also with a statute providing as ground for divorce imprisonment in the state penitentiary for two years under a sentence of seven years or longer. It held that the divorce statute "in pari materia with the civil death statute, convinces us that the Legislature did not intend that the civil death statute should have the effect of dissolving the marital status."

Oregon law (sec. 9–907, Oregon Compiled Laws Annotated) provides that conviction of a felony shall be ground for divorce. In our view the Oregon legislature, having expressly provided means for dissolution of a

marriage to a felon, could not have intended the civil death statute to have such effect.

This would appear to be in accord with the general view that in absence of express language such statutes are not to be broadly construed. In Platner v. Sherwood, 6 Johns. Ch., 118, 129, Chancellor Kent points out that at common law civil death did not apply to persons attainted of felony but "seems to have been confined to the cases of persons professed, or abjured or banished the realm." In 139 A.L.R. 1308, 1310, the annotator states, "* * * even where a statute has incorporated [civil death] as a part of the punishment for crime, the courts have been reluctant to invoke it unless the express language of the statute left no escape and compelled them to do so."

We conclude that the Villalon marriage was not terminated under Oregon law by Villalon's civil death.

*Second:* Appellant contends that the Villalon marriage was terminated by divorce prior to the Knox marriage. The question here is essentially one of fact rather than law. Appellant's contention essentially is that the trial court believed the wrong witnesses, a contention we would ordinarily dismiss without discussion. The facts are, however, helpful in depicting a full chronology of events and were established by depositions which are before us to the same extent as they were before the trial court.

We note, therefore, that after serving a few years of his sentence Villalon was, in 1939, deported to the Philippine Islands. In 1951 his whereabouts were ascertained by Thompson. On October 29, 1951 he voluntarily appeared in the office of a Manila attorney for respondent and made affidavit that he had married appellant in Vancouver, Washington in 1933; had never heard from her since his deportation; and had never secured a divorce or annulment of that marriage.

Subsequent to commencement of this action steps were

taken by respondent to establish these facts by the taking of Villalon's deposition. In that deposition taken in April 1952, Villalon stated that he had in truth obtained a divorce from appellant in the Philippine Islands during the Japanese occupation in 1943; that he was unable to obtain official proof since all court records had been destroyed; that he had understood his affidavit to refer only to an American divorce. Opposing this deposition were the depositions of two attorneys who had taken the affidavit and twice conferred with Villalon with reference to the matter. They leave little doubt but that any such limitation could never have been intended or understood to apply. The interviews and affidavit obviously were for the purpose of determining the present marital status of Villalon and appellant. One of these attorneys further testified that in June, 1952 Villalon had offered to retract his testimony relative to the Philippine divorce if paid 5,000 pesos.

Fortifying respondent's position were a letter from the Philippine judge and depositions of court officials who, while without benefit of records, nevertheless gave convincing testimony to the effect that they had no recollection whatsoever of such a divorce proceeding; that divorce is extremely rare in the Philippines; that had one occurred they certainly would have recalled it, particularly one between a Filipino and an American.

Supporting Villalon's deposition were the depositions of two of his friends who had known him since boyhood. One testified that he had taken Villalon to the lawyer (who since had died) who had represented him in the divorce proceedings; and that he had later been shown a copy of the divorce decree (which copy was never produced; its absence never explained). The other testified that he had been present in court when the matter was tried and the decree granted. The testimony of both was vague and uncertain.

The court below stated, "There is no credible testimony to show any divorce or annulment and there was overwhelming evidence to show that a divorce was not

granted at the time Villalon says there was one granted." With this statement we are in full accord after a study of the record.

Appellant asserts the presumption of validity of the Knox marriage, a presumption discussed by this court, In Re Aguirre's Estate, 57 Nev. 275, 280, 62 P.2d 1107, 1109, 65 P.2d 685, where other authority was quoted as follows, "When there has been a formal marriage, according to legal requirements, the law will presume the competency of the parties to enter into the marriage contract, and will presume that any former marriage of either of the parties was dissolved by death or divorce. This is based on the desire of the law to protect innocence, morality and legitimacy rather than to presume the continuance of the first marriage." To the same effect, Parker v. DeBernardi, 40 Nev. 361, 164 P. 645, is cited.

This presumption might well have proven decisive of the validity of the Knox marriage had the whereabouts of Villalon or his continued existence been unknown. Ordinarily it is in such cases that resort to the presumption is had. See note: 89 Am.St.Rep. 204. The presumption, however strong, is clearly rebuttable (Clark v. Clark, 44 Nev. 44, 189 P. 676, 194 P. 96) and we are wholly unable to state that the trial court erred in assessing respondent's proof of sufficient weight to overcome the presumption, aided or handicapped as it may have been by the discredited testimony of Villalon. Certainly it cannot be said that the effect of the presumption was to compel the court to believe appellant's witnesses rather than respondent's. As stated by the author of the note, 89 Am.St.Rep. supra, page 206, "A rule of law which allows an artificial or technical force to be given evidence * * * beyond its natural tendency to convince the mind, and requires courts and juries to presume as true that which probably is false, cannot but be fraught with dangerous circumstances."

Accordingly the finding of the trial court that the Villalon marriage was not terminated by divorce is held to be supported by the record. It will not be disturbed.

*Third:* Appellant contends that notwithstanding the fact that the Villalon marriage continued to exist, the Knox marriage was valid since for more than five years prior thereto Villalon had been absent and not known by appellant to be living.

Sec. 10138, N.C.L.1929, absolves appellant from prosecution for bigamy under these circumstances but this result does not breathe life into the Knox marriage. It renders it neither valid nor merely voidable. Under sec. 4066, N.C.L.1929, such marriages are "absolutely void without any decree of divorce or other legal proceedings." In support of her contention appellant relies on In Re Borneman's Estate, 35 Cal.App.2d 455, 96 P.2d 182. Express statutory provisions render that case clearly distinguishable.

We conclude that the Knox marriage was wholly void by virtue of the fact that appellant was then married to another living person.

*Fourth:* Appellant contends that, accepting that the Knox marriage was void, there is no basis for holding that concealment of the fact of the Villalon marriage was with fraudulent intent. She asserts that the question of the existence of that marriage itself presents vexing questions of law and fact; that if she was in error in her belief that the marriage had been terminated, there is nothing to indicate that such belief was not an honest one.

Again we are confronted with an issue of fact rather than law. Our question is whether there is evidence upon which the trial court might have found fraudulent intent to have existed.

Unquestionably such subjective and intangible matters as frame of mind or intent are difficult to prove objectively. In our view, however, the record has successfully demonstrated fraud. This it has done by proof of a course of conduct on the part of appellant, frequently involving deliberate falsehood, extending from the time of the Villalon marriage to the commencement of this suit, which course can hardly be deemed consistent with any proposition other than a deliberate intent to conceal the fact and avoid the effect of the Villalon marriage at all times and at all costs.

In 1937, while Villalon was still imprisoned, appellant was married to one Paul Deuell in Vancouver, Washington, the same locality in which she had married Villalon four years earlier. In her application for license she stated herself to be a single woman and falsified her name and her father's name, assuming for them both the surname of Lane rather than Names. In 1940 (Deuell having obtained an annulment of the marriage) appellant was married in Virginia City, Nevada, to one Joseph DeRose. In her application she falsely stated that she had never been married before. This marriage was terminated by divorce just prior to her marriage to Knox.

In 1950, after distribution to her of the Knox estate but before the probate court had lost jurisdiction to set it aside, appellant brought proceedings in Winnemucca, Nevada, to annul her marriage to Villalon. She named herself in this proceeding as "Phyllis Lucille Villalon, also known as Phyllis Lucille Names." The name which she was then using and under which she had secured distribution of the Knox estate, "Geral Phyllis Knox," nowhere appeared in the proceeding. There was nothing to connect her with the distributee of the Knox estate. A decree of annulment was granted in January 1951.

The trial judge, with this evidence freshly before him and with the advantage of observation of appellant in giving testimony under oath, flatly stated that she had

demonstrated such disregard for the truth as to discredit her testimony. He stated, "When she says she thought [Villalon] was civilly dead and therefore it was not necessary to obtain a divorce from him * * * that is a fabrication. The court doesn't believe that statement and thinks she never thought of that until this suit was commenced." The record, in our view, supports this statement and the court's finding that appellant's concealment of the fact of the Villalon marriage was with fraudulent intent and scienter.

*Fifth:* Appellant contends that, accepting a fraudulent intent or scienter, the court erred in determining that her failure to disclose the fact of the Villalon marriage was fraudulent conduct. She asserts that fraud by concealment can exist only where there is an obligation to speak, such as is created by the existence of a fiduciary or confidential relationship.

The suppression of a material fact which a party is bound in good faith to disclose is equivalent to a false representation, since it constitutes an indirect representation that such fact does not exist. See: 37 C.J.S. 244, Fraud, sec. 16a. It is clear, however, that an obligation to speak must exist. Thus, in a suit for equitable relief from a judgment, such as this, mere failure to disclose facts which, if known, would have prevented recovery is not necessarily fraud of any kind. Certainly a party's failure voluntarily to disclose to the court or to his adversary the weakness of his own case or defense is not justification for vacating a judgment. Ward v. Town of Southfield, 102 N.Y. 287, 6 N.E. 660; Stout v. Derr, 171 Okla. 132, 42 P.2d 136.

Yet, even in absence of a fiduciary or confidential relationship and where the parties are dealing at arm's length, an obligation to speak can arise from the existence of material facts peculiarly within the knowledge

of the party sought to be charged and not within the fair and reasonable reach of the other party. Under such circumstances the general rule is that a deliberate failure to correct an apparent misapprehension or delusion may constitute fraud. This would appear to be particularly so where the false impression deliberately has been created by the party sought to be charged. See: 37 C.J.S. 245, Fraud, sec. 16b; 23 Am.Jur. 857, Fraud and Deceit, sec. 80; Restatement of the Law, Judgments, sec. 121, quoted infra.

In the case before us the facts may truly be said to have been peculiarly within the knowledge of appellant. No ordinary investigation could have been expected to disclose them. In the absence of any disclosure by her she had every reason to believe that the truth never would come to light. Cf. Toledo Scale Co. v. Computing Scale Co.; 261 U.S. 399, 67 L.Ed. 719, 43 S.Ct. 458; Graham v. Graham, 251 Ala. 124, 36 So.2d 316; Ward v. Town of Southfield, supra. Moreover, the very reason for the peculiar obscurity of the truth was appellant's own previous conduct of falsehood in the deliberate and continued misrepresentation of her marital status and suppression of the truth with respect thereto over a period of more than twelve years. Accord: Caldwell v. Taylor, 218 Cal. 471, 23 P.2d 758, 88 A.L.R. 1194.

We conclude that failure to disclose the fact of the Villalon marriage constituted fraudulent concealment.

*Sixth:* Appellant contends that, accepting that she was guilty of fraud, her fraud was not of such a character as to warrant intervention by a court of equity; that her fraud was intrinsic rather than extrinsic.

By the leading case of U. S. v. Throckmorton, 98 U.S. 61, 25 L.Ed. 93, fraud which will warrant equitable relief from a final and valid judgment is limited to that which is "extrinsic or collateral to the matter tried by the first court, and [does not include] fraud in the matter on

which the decree was rendered." Extrinsic fraud is defined as fraud by reason of which "there was, in fact, no adversary trial or decision of the issue in the case"; where "there has never been a real contest in the trial or hearing of the case." Accord: Confer v. Dist. Ct., 49 Nev. 18, 234 P. 688, 236 P. 1097; Murphy v. Murphy, 65 Nev. 264, 193 P.2d 850.

In 3 Freeman on Judgments (5th ed.) 2567, sec. 1233, the rule is expressed as follows: "It must be borne in mind that it is not fraud in the cause of action, but fraud in its management, which entitles a party to relief. * * * If the cause of action is vitiated by fraud, this is a defense which must be interposed, and unless its interposition is prevented by fraud, it cannot be asserted against the judgment; * * *. The fraud must be 'in some matter other than the issue in controversy in the action.' "

Appellant asserts that if she was guilty of fraud, it was in representing herself to be Knox's widow; that her widowhood was the very issue determined by the probate court upon her application for letters; that any fraud relating thereto was therefore intrinsic; that while it may have involved perjury, this itself is regarded as intrinsic fraud; that her representations to Thompson on the occasion of her visit to him, as a result of which he renounced his right to serve as executor, were but reiterations of the matter contained in her application for letters and could add nothing to the factor of perjury.

It is clear that perjury alone does not constitute extrinsic fraud. Confer v. Dist. Ct., supra; Chamblin v. Chamblin, 55 Nev. 146, 27 P.2d 1061; See: Restatement of the Law, Judgments, sec. 126, comment c. But where the defeated party, having exercised due diligence, has been prevented from exposing the perjury by some act of fraud of the other party, such act of fraud may furnish grounds for equitable relief. Chicago, R. I. &

P. R. Co. v. Callicotte, C.C.A. 8th, 267 F. 799, 16 A.L.R. 386, certiorari denied 255 U.S. 570, 65 L.Ed. 791, 41 S.Ct. 375; See: Electric Plaster Co. v. Blue Rapids City Township, 81 Kan. 730, 106 P. 1079, 25 L.R.A. (N. S.) 1237.

It is not alone what was said by appellant to the court and to Thompson which interests us; it is what remained unsaid and the effect of such concealment upon Thompson. If appellant had been under no duty to disclose the fact of the Villalon marriage, the situation might well have been different. Under the circumstances of this case, as we have noted, appellant's silence was equivalent to an affirmative act of fraud independent of her acts of perjury.

Furthermore, regardless of the apparent scope of the issue determined by the probate court, concealment of a defense relating thereto was not intrinsic fraud. It operated in this case to deprive Thompson of a fair opportunity to defend as effectively as though he had been forceably restrained from attendance in court. Graver v. Faurot, C.C.A. 7th, 76 F. 257; Caldwell v. Taylor, supra; See: 3 Freeman on Judgments (5th ed.) 2571, sec. 1234.

The applicable rules are set forth in the Restatement of the Law, Judgments. Rule 118 states the general proposition: "Subject to general equitable considerations, * * * relief from a valid judgment will be granted to a party to an action injured thereby if in the action he had no reasonable opportunity to have determined impartially a meritorious claim or defense which he had." Rule 121 states more specifically: "Subject to general equitable considerations, * * * equitable relief from a valid judgment will be granted to a party to the action injured thereby if the judgment was based upon a fraudulent claim or defense which he did not contest because he was (a) fraudulently misled by the other party to believe that he had no claim or defense, or (b) prevented by duress from contesting it."

The rationale of the latter rule is stated in sec. 121, comment a, page 588 as follows, "*  *  *  [T]he fact that a judgment is based upon a claim or defense known to be groundless or that such judgment is the result of perjured evidence is not of itself sufficient for equitable relief to a party injured thereby. Ordinarily it is a party's misfortune that he cannot produce evidence in time to support his position and rebut the perjury of his opponent by utilizing the normal channels by which a new trial or review can be obtained.

"Where, however, a claim is fraudulently advanced and the fraud is so successful that the other party to the action is not even aware that he has a possibility of a claim or a defense, it may be said that he has had no reasonable opportunity to present it and this, combined with the fraud, is a sufficient basis for equitable relief.

"The fact that the other party was aware of the invalidity of his claim or defense is not of itself a sufficient basis for equitable relief against the effects of the judgment. To permit such relief, it is essential that there should be wrongful and misleading conduct. Such conduct ordinarily involves perjury and frequently involves the forgery of documents. It may, however, consist of pressing a claim known to be non-existent combined with suppressing facts solely and peculiarly within the knowledge of the person obtaining the judgment. * * * [E]quitable relief is granted only where the deceived person had no reasonable means of information and where he could not have succeeded in obtaining the truth by the pursuit of such means of information as he had. Equitable relief is most frequently granted in cases where the successful litigant had in his power substantially all the means of information."

Among the situations stated to fall within the rule are "those where a person makes a false claim of heirship under circumstances giving it great credibility."

Accord: El Reno Mut. Fire Ins. Co. v. Sutton, 41 Okla. 297, 137 P. 700, 50 L.R.A. (N.S.) 1064; See comment note 88 A.L.R. 1201, 1207; note 21 Col.L.Rev. 268.

We conclude that appellant's concealment of the fact of the Villalon marriage was extrinsic fraud; that equitable intervention to provide relief from the resulting judgment was proper.

It remains to be noted in all fairness that nothing in the record reflects upon counsel for appellant or in any way indicates that he was a party to his client's fraud. He appears simply to have retained a belief in the truth of her statements and in her good faith which the trial court was unable to share.

Judgment affirmed with costs.

EATHER, C. J., and BADT, J., concur.