A. B. C. PACKARD, INC., a Corporation,
Appellant,

v.

GENERAL MOTORS CORPORATION, a
Corporation, Appellee.

No. 16013.

United States Court of Appeals
Ninth Circuit.

Jan. 27, 1960.

Pacht, Ross, Warne & Bernhard, Clore Warne, Stuart L. Kadison, Harvey M. Grossman, Los Angeles, Cal., Preston, Thorgrimson & Horowitz, Charles Horowitz, Seattle, Wash., for appellant.

Henry M. Hogan, Daniel Boone, Ed. J. McGratty, Jr., Detroit, Mich., Holman, Mickelwait, Marion, Black & Perkins, William M. Holman, J. Paul Coie, Seattle, Wash., for appellee.

Before CHAMBERS, BARNES and HAMLEY, Circuit Judges.

BARNES, Circuit Judge.

This is an action by Mr. M. O. Anderson who, either individually or through a corporation controlled by him, was from 1936 to June 30, 1953 a distributor-dealer in Buick automobiles manufactured by the defendant. Mr. Anderson sued for damages allegedly arising from a fraud perpetrated on him by defendant when it terminated the distributor-dealer relationship, and offered to make Anderson a dealer.

Appellant is a Washington corporation and appellee is a Delaware corporation. Jurisdiction in the district court derived from diversity of citizenship and the rights of the parties are governed by state law. 28 U.S.C. § 1332. Angel v. Bullington, 1947, 330 U.S. 183, 67 S.Ct. 657, 91 L.Ed. 832. This Court has jurisdiction of the appeal. 28 U.S.C. § 1291.

Appellant states two theories to sustain recovery—*first*, the nondisclosure by General Motors of General Motors' secret policy to terminate the Anderson dis-

tributorship when it became more profitable for General Motors to distribute Buick automobiles itself; *secondly*, misrepresentations made to Anderson by General Motors to the effect that the Anderson distributorship would not be terminated so long as its performance was satisfactory.

The case was tried below with a jury. The jury returned a general verdict for the defendant, and answers to some twenty-eight special interrogatories. They were numbered one to ten, but several contained subsidiary questions. These interrogatories and the answers thereto are important to this appeal. They read as follows:

"1. On November 9, 1951, did Jerome B. Nash in words or substance state and represent to M. O. Anderson that Anderson Buick Company need not concern itself about termination of its distributorship as long as it continued to penetrate the market and maintain price class performance and for at least so long a period as was required to amortize the $500,000 mortgage?

"Answer: No.

"2. Was the making of such a statement within the scope of the authority of Jerome B. Nash?

"Answer: No.

"3. Did General Motors during the period 1937–1941 formulate and adopt a policy which in substance provided for the termination of the distributorship of Anderson Buick Company after it had developed the market for Buick automobiles, parts and accessories in the territory assigned to it to a point when it would be more profitable for General Motors itself to distribute?

"Answer: No.

"4. *Did General Motors have such a policy on November 9, 1951?*

"Answer: *Yes.*

"5. Did General Motors continuously have such a policy for the period from 1941 to July 10, 1952?

"Answer: No.

"6. If you have found that this statement of Jerome B. Nash was made on November 9, 1951,

"A. Was the statement true or false?

"B. Did Anderson Buick Company believe the statement to be true?

"C. Did Anderson Buick Company act in reliance upon the statement?

"D. Was it reasonable for Anderson Buick to act in reliance upon it?

"E. Did Anderson Buick Company sustain damage as a result of such reliance and action?

"F. In that event what was the amount of such damage?

"Answer: (Question not answered.)

"7. *Was the relationship between Anderson Buick Company and General Motors Corporation such a relationship as required the disclosure of such a policy, if you have found that there was such a policy, by General Motors to Anderson Buick Company?*

"Answer: No.

"8. *If you have found that there was such a policy of General Motors was that policy known to Anderson Buick Company or should it have been known to Anderson Buick Company in the exercise of ordinary business prudence?*

"Answer: No.

"9. (a) Did Anderson Buick Company take action in ignorance of a matter which General Motors was required to disclose to Anderson Buick Company because of the relationship between Anderson Buick Company and General Motors?

"Answer: No.

"(b) Did Anderson Buick Company sustain damage as a result of such action? Answer: (Question not answered.)

"(c) What was the amount of such damage, if any, which Anderson Buick Company so sustained?

"Answer: (Question not answered.)

"10. A. With respect to the annual agreements, were the following agreements executed by Anderson Buick because of business compulsion as that term has been defined for you. Answer Yes or No with respect to each separate agreement dated—

"I. November 1, 1947. Answer: No.
"II. November 1, 1948. Answer: No.
"III. November 1, 1949. Answer: No.
"IV. November 1, 1950. Answer: No.
"V. November 1, 1951. Answer: No.
"VI. November 1, 1952. Answer: No.

"B. With respect to the annual agreements, answer with respect to each of the agreements listed here, whether plaintiff signed them because of a non-disclosure of a matter which General Motors was required to make to Anderson Buick Company. Answer Yes or No with respect to each separate agreement dated—

"I. November 1, 1947. Answer: No.
"II. November 1, 1948. Answer: No.
"III. November 1, 1949. Answer: No.
"IV. November 1, 1950. Answer: No.
"V. November 1, 1951. Answer: No.
"VI. November 1, 1952. Answer: No."

(The foregoing emphasis was added by appellant.)

Interrogatory number six was divided into six parts, but was to be answered only if interrogatory number one (as to Nash's alleged representations) was answered in the affirmative. Because interrogatory number one was answered in the negative, no answer was required of the jury as to interrogatory number six. And the negative answer to nine(a) made answers to nine(b) and nine(c) unnecessary.

Judgment in favor of the defendant was entered based on the jury's general verdict. The trial judge previously had dismissed M. O. Anderson, individually, as a plaintiff. At the time of the jury's verdict the trial judge had under consideration a motion to dismiss as to A. B. C. Packard, Inc., the successor corporation to the one Anderson, with the defendant's help, had originally organized. After the jury's verdict the trial judge indicated he was in accord with the jury's findings.

Appellant raises five specifications of error which we shall consider in turn:

I. THE COURT ERRED IN FAILING TO INSTRUCT THE JURY THAT GENERAL MOTORS OWED ANDERSON A DUTY TO DISCLOSE AS A MATTER OF LAW.

II. THE COURT ERRED IN REFUSING TO SUBMIT TO THE JURY ANDERSON'S CLAIM BASED ON NASH'S 1947 REPRESENTATION TO ANDERSON.[1]

III. THE COURT ERRED IN INSTRUCTING THE JURY THAT ANDERSON WAS PRECLUDED FROM CLAIMING THAT HE SIGNED THE DISTRIBUTORSHIP AGREEMENT OF NOVEMBER 1, 1952 BECAUSE OF GENERAL MOTORS' NONDISCLOSURE OF ITS DISTRIBUTORSHIP POLICY.

IV. THE COURT ERRED IN AWARDING GENERAL MOTORS AS AN ITEM OF COST REPORTERS' FEES FOR PREPARING A TRANSCRIPT OF THE PROCEEDINGS AT THE TRIAL.

### I.

The fifth point is the point we shall first mention. It was that:

THE COURT ERRED IN GRANTING DEFENDANT'S MOTION FOR A DIRECTED VERDICT AND MOTION TO DISMISS PLAINTIFF'S ACTION FOLLOWING THE VERDICT OF THE JURY.

■ Although the trial court on August 28, 1957 entered an order "granting defendant's motion for directed verdict and motion to dismiss," it subsequently, on August 30, 1957, signed and entered a judgment based on the jury's verdict in favor of General Motors Corporation, a Delaware corporation, and against the A. B. C. Packard, Inc., a Washington corporation. Appellant in its brief has stated it considered the judgment on the verdict the matter to be considered on this appeal (Appellant's Brief, p. 37, n.

---

1. Not to be confused with Nash's alleged 1951 representations to Anderson which the jury found Nash had not made (interrogatory number one, *supra*).

31). Inasmuch as appellant appealed only from the August 30, 1957 judgment (as amended), and the order denying a new trial, the August 30, 1957 judgment is the only matter before us. We therefore will not consider appellant's point III (described herein as Point V) with respect to the August 28, 1957 order.

## II.

We turn next to the principal issue on this appeal—did General Motors owe a duty to Anderson *as a matter of law* to disclose "General Motors Distributorship Termination Policy," and secondarily, if so, should the court have then so instructed *as a matter of law* instead of submitting the question to the jury (which found there was no duty to disclose)?

The existence or nonexistence of the duty to disclose depends generally upon the relationship between the parties. In this instant case we have two business entities entering into annual contracts over a period of eighteen years. There is no question but that one party was, during all that time, an economic giant,

the other, relatively, an economic pigmy. Such economic inequality may well be a tangible force of tremendous power in shaping the terms of the contract eventually signed, or may preclude the smaller entity from willingly entering into any contract.[2] But once the contract is signed, such economic inequality *per se,* does not create a legal fiduciary relationship between the contracting parties, *absent* (a) those terms within the contract sufficient to create that relationship; or (b) those facts outside the contract which, *per se,* create "fraud" sufficient to require the creation of a duty to disclose no matter what technical relationship may be created by the terms of the contract.

To establish such a duty to disclose, appellant relies on two Washington cases, Ikeda v. Curtis, 1953, 43 Wash.2d 449, 261 P.2d 684, and Perkins v. Marsh, 1934, 179 Wash. 362, 37 P.2d 689, and the Restatement of Torts § 551, 37 C.J.S. Fraud § 16 and 23 Am.Jur., Fraud & Deceit, § 78. Neither of the cases cited by appellant seem applicable to the factual situation here existing.[3]

---

**2.** This disparity in economic power and its effect upon the dealer-manufacturer relationship has been commented upon by many witnesses before Congressional Committees, and by a greater number of writers.

"Through their dominant economic position, the manufacturers have employed the franchise, a 'one-sided document which is neither contract, license, or agreement' (8 S. Hearings, General Motors 4104) to gain maximum control over the management of the dealer's business without corresponding 'legal' responsibility." Kessler-Automobile Dealer Franchises: Vertical Integration by Contract. 66 Yale L.J. 1135, 1138.

"An examination of the various dealer franchises revealed that while bilateral in form they were unilateral in fact." McHugh: The Automobile Dealer Franchise Act of 1956–2 Anti-trust Bull. 353 (1957) 355; note 13.

And we now have legislative recognition of the problem in the Automobile Dealers' Day in Court Act, giving a right of action based on the failure of the manufacturer to act in good faith "in terminating, canceling, or not renewing the franchise" of a dealer. 70 Stat. 1125

(1956), 15 U.S.C.A. §§ 1221–1225 (1958). This act became effective August 8, 1956, and is not applicable in the instant case.

**3.** (a) Perkins v. Marsh, 1934, 179 Wash. 362, 37 P.2d 689, was a landlord and tenant case, wherein the landlord sued the tenant for rent. The defense was constructive eviction, based on the fact the basement rented so filled with water during the rainy season as to prevent its use. When denied recovery, the landlord appealed, claiming there is no implied covenant that the property rented is fit for a particular use. The appellate court affirmed, approving the general rule, but *held*: that there exists an exception to that general rule, *i. e.,* where there are concealed defects in demised premises, sufficient to render the premises unusable, known to the landlord, which the lessee could not discover with reasonable diligence, fraud is established.

(b) Ikeda v. Curtis, 1953, 43 Wash.2d 449, 261 P.2d 684, was an action for fraud in the sale of hotel property. A fifty-three room hotel was represented as having thirty-four or thirty-five permanent guests. The hotel had been used as a house of assignation or prostitution, and

Here during the entire period of appellant's operation the relationship between the parties was governed by written contracts identical to those used generally by Buick distributors throughout the United States. These contracts spelled out in detail the rights and obligations of each of the parties. While appellant contended that each of these contracts was entered into as a result of business compulsion and was induced by fraud based on a lack of disclosure, the jury specifically found that each (at least from 1947 to 1952, inclusive) was entered into as the free act of the parties thereto. Each agreement was for the stated term of one year, each was subject to cancellation by either party (by the appellant on thirty days' notice and by the appellee on ninety day notice); each was a personal service contract, cancelable immediately if the individual appellant died or became insolvent. Each agreement provided that the appellant-distributor was not the agent nor legal representative capable of binding the appellee; each provided that there were no other agreements or understandings, either oral or written, between the parties.[4]

The trial court came to the conclusion, independently of the jury, that there was nothing in the relationship between the parties, either as created by the terms of the contract or by reason of any factual situation existing *dehors* the contract, that created a relationship of trust and confidence between the parties sufficient to compel the disclosure of any indefinite future policy to discontinue its then existing methods of selling automobiles.[5]

■ Thus Section 551 of the Restatement of Torts cited by appellant has no application. If one party has an absolute right to cancel a contract with or without cause at any time upon a month's notice, he can be under no duty to dis-

---

had twelve permanent tenants. The misrepresentation was not as to the *amount* of the income, but as to its *source*. The lower court held there had been fraud. *Held:* "We held in Perkins v. Marsh (supra) that, under certain circumstances, there is a duty to disclose a material fact even where there was no fiduciary relationship * * *.

* * * * *

" * * * Under the peculiar circumstances of this case, it was the duty of appellant to reveal the source of her income to respondents." 261 P.2d at page 691.

4. "35. *Sole Agreement of Parties.*

"No change in, addition to, or erasure of any printed portion of this Agreement (except the filling in of blank lines) shall be valid or binding upon Seller unless the same is approved in writing by the General Manager or General Sales Manager of Seller.

"No agreement between the parties which is at variance with any of the provisions of this Agreement or which imposes definite obligations upon either party not specifically imposed by this Agreement or which is intended to be effective or performed following the expiration or other termination of this Agreement and imposes obligations or extends the time for performance thereof other than as provided in this Agreement shall be binding upon either party unless executed by Distributor and the General Manager or General Sales Manager of Seller.

"There are no other agreements or understandings, either oral or in writing, between the parties affecting this Agreement or relating to the sale or servicing of Buick motor vehicles, chassis, parts or accessories.

"This Agreement cancels and supersedes all previous agreements between the parties."

(Exhibit "A"—"Distributor Selling Agreement"—¶ 35.)

For a discussion of this type of "entire agreement" clause, see 66 Yale L.J. 1135, 1139, and 57 Colum.L.Rev. 219, 220, n. 5.

5. The trial court, after recording the jury's verdict, said:

"The compulsive force of these agreements and of the action of the parties under them leads the Court to conclude as a matter of law that the relationship between the parties was not such as placed defendant in a position of superiority and influence where it controlled the action and decision of the plaintiff and created a relationship of trust and confidence which impelled the disclosure of any policy which indicated the ultimate and certain discontinuance at an indefinite date in the future of plaintiff's distributorship.

"This is especially so when considered in light of the provisions, repeated through the years, which granted plaintiff the right to cease to continue as dis-

close the possibility of a change in business procedures which might cause him *in futuro* to fail to renew a contract which has then terminated by its express terms. Nor do we find any relationship created by the course of dealings between the parties in this case comparable to the legal relationships enumerated in 37 C.J.S. Fraud § 16d.[6]

Failing to bring its case within the facts of the cases cited or the general principles of law enunciated in the reference volumes, appellant nevertheless persists that General Motors had a duty of disclosure as a matter of law because there allegedly exists a clear *trend* of authority to establish such a duty "whenever it is required in the interests of fair dealing." To become more than a trend there must exist either legislation or much clearer and much greater judicial recognition of the worth of the legal theory, which as yet must be held a theory, and nothing more.[7]

In support of the thesis that here there existed a confidential relationship, requiring disclosure of future policy, appellant cites various cases. We have carefully gone over them and find apt language, but none factually comparable to the facts existing in this case.[8]

Applying the general language of the cases cited in note 7, with their differing facts, appellant seeks to apply the general rule that "a confidential relationship, as that term is understood in the law of

tributor at any time, for [no] cause, upon thirty days notice. No relationship of trust and confidence existed as a matter of law.

"The Court will assume arguendo that such a relationship of trust and confidence did, nevertheless, exist.

"The agreements lead irresistibly to the conclusion as a matter of law that plaintiff cannot maintain that it took action in ignorance of an undisclosed policy which it would not have taken had the policy been disclosed or known to it. In this consideration, we do not weigh the plaintiff's long years of active experience in the automobile industry, his active participation on trade associations or his wide reading of trade publications. We are, nevertheless, led to these conclusions by reason of the repeated inclusion throughout the years of provisions of time limitation upon the term of the distributorship; by the provisions that the agreements contain and embody all the understandings between the parties, by the provision limiting authority to modify to defendant's two specified officers; and by the consistently manifested policy of the defendant not to grant agreements for more than one year." (Tr. Vol. VI, pp. 2474–75.)

6. Attorneys and clients; Officers of a corporation and stockholders; Joint purchasers; Joint Sellers; Partner and co-partner; Persons under contract to marry; Physician and patient; Priest and parishioner; Principal and agent; Trustee and *cestui que trust;* Makers of contracts of insurance and policy holder.

7. 23 Am.Jur. 854, 856; Keeton: Fraud— Concealment and Nondisclosure, 15 Tex. L.Rev. 1–12 (1936). At best, the law review article characterizes courts as "drawing away" from a theory of law based on freedom of contract, to a theory based on demands of "justice, equity and fair dealing." Dean Prosser comments "[T]hat the law appears to be working toward the ultimate conclusion that full disclosure of all material facts must be made whenever elementary fair conduct demands it."

While excellent authority for the depiction of a possible trend in law, this is woefully weak authority for asking a court to decide the issue of the relationship between the parties as a matter of law. It is no authority where the facts, and the inferences to be drawn therefrom, which make up the relationship are in serious dispute, as they were in this case. Nor is it any authority for a determination by the court as a matter of law that the relationship, having once been determined, required the disclosure of the precise bit of information here deemed critical.

No cases are cited by appellant which approve the theory advanced by Mr. Keeton in his law review article. Apparently no court, during the twenty-three years since its (the law review's) publication, has seen fit to adopt his theories.

8. Stilber v. Vanderlip, 1939, 136 Neb. 862, 287 N.W. 773.
Plaintiff, an eighty year old woman, having physical infirmity and mental instability, made a contract with her daughter prepared by attorneys who represented both mother and daughter. The contract provided for her support and the conveyance of all her property. She

fraud, existed between General Motors and Anderson in this instant case * * * [due] in part from the fact the distributor is an agent of the manufacturer."

The relationship created by the written contract between a manufacturer and a distributor of automobiles depends upon the terms of that contract, not the label of "Distributor" and "Seller." Here by its express terms the distributor was not the agent or legal representative of the seller *"for any purpose whatsoever."* Compare such denial of agency

sued to cancel the contract, and the judgment in her favor was affirmed.

Wilson v. Rentie, 1926, 124 Okl. 37, 254 P. 64.

Plaintiffs, illiterate negroes, seventy-seven years of age, sued to reform a so-called royalty deed of oil rights. They had been offered $250 per acre for all their one-eighth interest, but sold it the next day to defendant for $125 per acre, thinking they sold but one-half of their one-eighth interest. They were told to sign the deed, without reading it, by one of their sons who was the defendant's paid agent. The lower court found fraud, and the appellate court affirmed.

Selle v. Wrigley, 1938, 233 Mo.App. 43, 116 S.W.2d 217.

Plaintiff, as an orphan at fourteen years of age, was placed with defendant on his farm and worked without wages. Upon reaching twenty-one, plaintiff was told he had been adopted by defendant and his sister, and was their heir. When later wages were demanded by plaintiff, defendant falsely wrote he was plaintiff's adopted father and that under the laws of Missouri an adopted son could not recover wages for services performed, nor could the adoption be terminated. Upholding a judgment for plaintiff based on fraud, the court said:

"The admitted facts in this case touching the relations between the plaintiff and the defendant show that the plaintiff, a mere orphan, the ward of an orphan society, came into the home of the defendant at the early age of fourteen years and that the defendant at once assumed authority over him and set himself up as the plaintiff's friend, adviser, and protector, assuming the place of a parent to him. He put him to work and directed his movements from day to day. By his attitude, his conduct, and his authority exercised, he readily obtained an influence over the plaintiff and naturally led him to repose confidence and trust in him." 116 S.W.2d at page 221.

Voellmeck v. Harding, 1931, 166 Wash. 93, 6 P.2d 373, 375, 84 A.L.R. 608.

For twenty years, defendant Harding had managed a corporation without either stockholders or directors meetings. Learning of an offer to purchase all corporate stock of a subsidiary at a price which would mean plaintiff and defendant would each receive at least $50,000, Harding, owner of one-fourth the stock in one of the corporations, purchased the stock of plaintiff (also one-fourth owner of the subsidiary corporation's stock) for $7,500 without disclosing his knowledge of the impending purchase. Harding also threatened Voellmeck with the loss of his job and represented he (Harding) was selling at the same price. *Held:* "While ordinarily a director of a corporation does not occupy a fiduciary relation to a stockholder, yet, under the circumstances of this instant case, such relationship did exist between Harding and the respondent." The recovery, based on fraud, was affirmed.

Klika v. Albert Wenzlick Real Estate Co., Mo.App.1941, 150 S.W.2d 18.

Plaintiff, an inexperienced woman, bought real property subject to a mortgage. Defendant represented the property was otherwise free and clear of liens, though knowing there existed tax liens for unpaid taxes and penalties for seven years. *Held:* Company and client relationship created duty to disclose tax liens. Judgment for plaintiff affirmed.

Kaze v. Compton, Ky.1955, 283 S.W.2d 204.

Where purchaser of a house sued in deceit for concealing fact a tile drain ran under the house, causing water to accumulate in house and yard, and jury returned verdict for plaintiff, action of trial court in setting aside verdict and granting summary judgment was error.

Kuhn v. Gottfried, 1951, 103 Cal.App. 2d 80, 229 P.2d 137.

Plaintiff sued to cancel a note given in payment of a medical practice. Defendant was found to have fraudulently concealed from plaintiff the fact that he was engaged in litigation with another doctor over the sale of the same practice; to have represented $500 worth of obsolete equipment was worth $5,000; etc. The sole question on appeal was the sufficiency of the evidence to support the findings. Judgment for plaintiff was affirmed.

Villalon v. Bowen, 1954, 70 Nev. 456, 273 P.2d 409.

Special administrator of estate of deceased sued alleged widow of deceased to

to the language used in the contract relied on by appellant in the case of Champion Spark Plug Co. v. Automobile Sundries Co., 2 Cir., 1921, 273 F. 74, at page 80. There the contract provided, " 'second party is hereby made and constituted sales agent and distributor by the first party.' The term 'agent' is employed."

As the court below instructed the jury (and we believe correctly), "these agreements constitute in law an absolute and complete refutation of any claim of reliance upon any representation other than those expressly set forth in the agreements," *unless* the jury found that appellant, as it charged, had been caused to enter into the agreements by "business compulsion," or fraud on the part of the appellee. Both by its general verdict and its answer to interrogatory ten, the jury answered, as to each year from 1947 to 1952, inclusive, that there had been no "business compulsion" on appellant and no signing of the agreements because of any lack of disclosure by General Motors to Anderson.

There is still another important practical matter to consider in connection with appellant's position that "if there was a duty on General Motors to disclose as a matter of law that it did not intend to perpetually renew its distributorship contracts, the jury's general verdict necessarily would have been in favor of Anderson rather than of General Motors."

That has to do with damages. We are here again required to turn to the law of Washington.[9] Nine essential elements of a cause of action for fraud have long been established by the Supreme Court of that state. Before recovery for fraud there must be proved (1) a representation of an existing fact; (2) its materiality; (3) its falsity; (4) the speaker's knowledge of its falsity or his ignorance of its truth; (5) his intent it should be acted on by the person to whom it is made; (6) ignorance of its falsity on the part of the person to whom it is made; (7) the latter's reliance on the truth of the representation; (8) his right to rely on it; and, (9) his consequent damage. Webster v. L. Romano Engineering Corp., 1934, 178 Wash. 118, 120–121, 34 P.2d 428, 430. The burden is on the plaintiff to prove all essential elements, and the absence of any of them is fatal to a recovery. Puget Sound National Bank v. McMahon, Wash.1958, 330 P.2d 559, 561.

Skipping for the present any question of an intent to deceive, and the alleged ignorance of the falsity, and the reliance claimed on behalf of appellant (all doubtful questions in view of the written contracts entered into by the parties and the questions left to the jury and decided by that body adversely to appellant), we come to the question of damages.

This case presents a most unusual factual situation in this regard. General Motors never refused to continue Anderson Buick Company as its dealer. On July 10, 1952, Anderson and four other Northwest distributors were told by Buick's general sales manager that the current distributor agreement with each of them, expiring by its terms on October 31st, 1952, would be renewed (by a new agreement) covering a period ending June 30, 1953, and that after that all five distributors would be on a direct dealer basis. (Defendant's Ex. A–68.) This was notice of the proposed change in General Motors' business practices of almost a year. With full knowledge of this

recover deceased's assets distributed to her. She was not lawfully the widow of deceased and fraudulently concealed this fact from the probate court. *Held:* Appellant held assets as trustee. The judgment was affirmed.
Everett v. Gilliland, 1943, 47 N.M. 269, 141 P.2d 326.
This was an action in fraud and deceit growing out of a $4,000 real estate sale. Seller represented that principal of $2,776 alone was due on mortgage.

Actually, $286.45 in interest was also due. Plaintiff bought seller's equity for $1,224, affirmed contract, paid off mortgage and interest, and sued for damages. *Held:* Silence or nondisclosure where there is a duty to speak will alone be sufficient to ground an action for deceit. On appeal, judgment affirmed.

9. Erie R. Co. v. Tompkins, 1938, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188.

proposed change, and on November 1, 1952, all five distributors including Anderson Buick Company entered into an agreement expiring June 30, 1953. We then quote from appellee's brief (omitting references to transcript):

"On May 22, 1953, Mr. Belfie wrote to appellant, among others, and advised it that Buick would offer it a direct dealer selling agreement, in the form then in effect with all Buick dealers, for a term beginning on July 1, 1953 and invited them to a meeting on June 9, 1953 at Seattle. Four of the distributors accepted direct dealer selling agreements. Appellant alone rejected the offer, although it was offered an exclusive franchise for the City of Seattle.

"Although repeated efforts were made by Buick to persuade appellant to accept a dealership contract, Mr. Anderson refused to consider the offer unless he was given special consideration of an undefined nature. Instead, he instituted negotiations with the Chrysler Corporation for a De Soto-Plymouth distributorship which began operations in mid-August, 1953.

"In March of 1954, a Packard distributorship was also undertaken.

"After the expiration of the Buick distributorship agreement on June 30, 1953, General Motors, in discharging in full each and every obligation imposed on it by the terms of the expired agreement paid Anderson Buick Company the sum of $145,112.68."

In 1936, when the business started, Anderson had invested $7,500 and General Motors $67,500. General Motors was paid off by Anderson from his profits. Again Anderson borrowed from General Motors, and again Anderson paid off. On the expiration date of June 30, 1953, Anderson's corporate net worth was $1,248,000, in round figures. During that time Mr. Anderson, individually, had realized from salary, bonus, withdrawals, dividends, capital gains on sale of property, rental income and increase in net worth, over $2,600,000.

During the later years of the representation of General Motors by Anderson, the retail operations were much more profitable than the wholesale operations. Although there is some dispute as to the exact figures, any comparison is striking. An audit by Lybrand, Ross Bros. & Montgomery, covering the years 1950, 1951 and 1952, shows a net profit from Anderson's retail operations of $942,081; from wholesale operations, $6,743 (Defendant's Ex. A-51).

On the financial statements furnished by Anderson Buick Company to Buick Motor Division, the same years show:

| Year | Retail Operations | Wholesale Operations |
|------|-------------------|----------------------|
| 1950 | 592,112 | 21,643 |
| 1951 | 223,983 | (17,826) loss |
| 1952 | 43,668 | ( 9,439) loss |

or a three year net profit of $859,763 from retail operations and a net loss of $5,622 from wholesale operations.

It is true that the foregoing would not establish as a matter of law the inability of appellant to prove some damage. It does not affect his right to claim a cause of action existed. But it highlights the difficult fact situation with which appellant took his case to the jury.

Such evidence undoubtedly had its very practical effect on the outcome of this litigation. It might partially explain (if we can ever explain accurately any jury's verdict) one reason influencing the jury's determination of many factual issues.

█ We conclude that the question as to whether General Motors had a duty to disclose any policy as to the renewals

of its yearly contracts to Anderson was a question of fact for the jury's determination under proper instructions. The latter were given. This was not an issue of law for the court to take from the jury, either in the court below or on this appeal.

### III.

Appellant's next point is that the court erred in refusing to submit to the jury Anderson's claim based on Nash's alleged 1947 representation to Anderson. (Nash was Regional Manager for Buick Motors Company.) Here appellant refers to Anderson's testimony of an alleged conversation and states generally that this "was more than sufficient to establish the making of the representations in question."

Factually, appellant devotes two pages of his ninety-three page brief to this discussion, in broad and general language, of the evidence on this point. He fails even to attempt to comply with our rules 18(d) and (e), 28 U.S.C. requiring him to point out the evidence by reference to page and volume. There are no references whatsoever to where any such evidence may be found in the record.

We need not point out that there was evidence in the record beyond appellant's testimony. This, because relying on appellant's testimony alone the trial court found as a matter of law that appellant's own version of Mr. Nash's telephone conversation with Mr. Anderson in July 1927 failed to establish actionable misrepresentation.

We have located and read the testimony in the record on which this finding is based. We agree with the trial court's conclusion that Nash merely confirmed the fact (already known to Anderson) that the distributorship of Howard Buick Co. of San Francisco was being cancelled because of its "poor job," that Anderson "had nothing to worry about" as long as he "did a job." "Mr. Curtice will later sit down and outline to you the long range program." The letter between the parties which followed (Plaintiff's Ex. 46) confirms this conversation. Furthermore, in its charge to the jury, the court set forth in detail Mr. Anderson's version of the conversation as well as Mr. Nash's conflicting version. The court then charged that while no recovery could be based thereon, the jury could and should consider the conflicting versions in connection with their consideration of the similarly conflicting versions of the conversation of November 9, 1951.

▆ Appellant made no objection and took no exception to the court's instructions in this respect and, accordingly, is barred by the provisions of Rule 51 of the Federal Rules of Civil Procedure, 28 U.S.C. from any claim that the court erred in so charging the jury. While appellant took an exception to an initial ruling made by the court for the benefit of appellant's counsel during the course of appellant's own case, appellant abandoned its contention that the July 1947 conversation constituted an independent basis of recovery by failing to object to the instructions given to the jury at the close of the entire case after appellee's evidence on the matter had been presented. Cf. National Surety Corp. v. City of Excelsior Springs, 8 Cir., 1941, 123 F.2d 573, 156 A.L.R. 422.

Further, even had the telephone conversation been sufficient factually to have constituted a misrepresentation, we still have the question of Nash's authority, in view of the terms of the contract, to act for General Motors; the matter of any intent to deceive; and the matter of any action on Anderson's part in reliance upon any alleged misrepresentation or nondisclosure by appellee. What Nash said was, at best, but an expression of opinion by him and not any misrepresentation of an existing fact.

▆ If there had been any point to be preserved, and not waived, appellant failed to preserve it by failing to object or take exception to the instruction [10] given by the court below to the jury that the written agreements barred any claim of

---

10. We speak here only as to lack of objection at the time of instruction.

reliance by Anderson other than those in the agreement, unless there was a finding by the jury of business compulsion or fraud. As we have said above, the jury found that appellant's execution of the agreements had not been so induced. The appellant is precluded from now claiming error.

## IV.

■ Appellant next urges that the court erred in instructing the jury that appellant was precluded from claiming that the distributorship agreement of November 1, *1952* was entered into in reliance upon alleged misrepresentation and nondisclosure.

As we have seen above, there had been a specific disclosure by General Motors on July 10, 1952 that after June 30, 1953 Anderson would no longer be made a wholesale distributor of Buick automobiles, but could remain as a dealer. Despite this Anderson entered into a new eight months' contract dated November 1, 1952.

Whether appellant knew of any "policy" on the part of General Motors to change its distributorship system *before* 1953 is immaterial, if appellant knew as a fact that General Motors was then changing its distributorship contract and would refuse to renew it with Anderson. Anderson knew this at least by July 10, 1952. If he knew of this fact, he could not have entered into any contract on November 1, 1952, under any *mistaken belief* or *reliance* upon a contradictory fact. The court so instructed.[11] The instruction was proper and we find no error.

## V.

Appellant's final specification of error has to do with an item of costs. Appellee claimed as costs the price of preparing a daily transcript of proceedings at the trial. Appellant objected, and the court clerk disallowed the item, there being no stipulation in the record and no order of court making such expense a taxable cost. Cf. Local Rule 56(g) (4), United States District Court for the Western District of Washington.[12]

On appellee's motion to retax costs,[13] the court made the following statement and order:

"The transcript of the minutes of the trial were necessary for the use of the Court. Each trial day found the minutes on the bench and frequent reference to them was made during trial by the Court, to the knowledge of counsel. When ruling upon various motions which involved the legal sufficiency of the evidence presented, the Court referred to the trial minutes. When passing upon requests to charge and in the preparation of the charge itself, the Court had frequent occasion to examine the testimony. This was particularly so when the Court prepared its statement of the undisputed facts, as well as when the analysis of the testimony was written on matters as to which there was a conflict.

"Early in the trial the Court inquired of the reporters whether the trial transcript was being secured by counsel, and was advised by the reporters that it was. The Court was furnished with a daily transcript by the reporters but at no time did the Court enter an order so providing or ask either counsel to provide the transcripts. The Court assumed that counsel had complied with the Local Rules. The minutes were necessarily obtained for use on the trial

11. "I charge you that since the final agreement of November 1, 1952 was entered into after July 10, 1952—the date of the Portland meeting—there may be no claim by plaintiff that this agreement was signed in reliance upon the alleged misrepresentation or because of the alleged nondisclosure."
(Tr. Vol. VI, pp. 2419-20.)

12. That rule reads in part: "When so ordered by the court or agreed to by stipulation of the parties, the fees of the reporter * * * for transcribing testimony [etc.] * * * shall be taxed as costs."

13. Fed.R.Civ.P. 54(d).

of this suit. The item on the Bill of Costs 'Court Reporter's Fees' is allowed to the extent of $17.05 and $2,185.00, totaling $2,202.05, and is disallowed as to the charge for copies. This memorandum shall be an order entered nunc pro tunc ordering a copy of the minutes." (Tr. Vol. II, pp. 526–527.)

■ Was the court without authority to make such an order? We think not. We attach no significance to the fact it was made "nunc pro tunc." That "Latin phrase is merely descriptive of the inherent power of the court to make its records speak the truth—to record that which was actually done, but omitted to be recorded." W. F. Sebel Co. v. Hessee, 10 Cir., 1954, 214 F.2d 459, at page 462. Here the making of the order at the hearing of the motion to retax costs was within the statutory authority of the court. 28 U.S.C. § 1920. This section reads in material part:

"Taxation of costs. A judge or clerk of any court of the United States may tax as costs the following:

\* \* \* \* \* \*

"(2) Fees of the court reporter for all or any part of the stenographic transcript necessarily obtained for use in the case."

This was a carry over provision from the Court Reporters Act of 1944, 58 Stat. 5,

28 U.S.C. (1940, Supp. V) § 9a(e), which read:

"In the discretion of the court any part or all of the fees for transcripts may be taxed as costs in the case."

And see the discussion by then Chief Judge Hincks in Perlman v. Feldmann, D.C.Conn.1953, 116 F.Supp. 102, 105–09, and cases cited.

■ The four cases cited by appellant on this point are not in conflict with our ruling.[14] Had any order of the trial judge been made here during the trial, including a finding of its necessity, no question as to it could be raised here. The trial judge has the right to make such an order, and only the question of his power and not any question of an abuse of discretion can be raised on appeal. W. F. & John Barnes Co. v. International Harvester Co., 7 Cir., 1944, 145 F.2d 915, certiorari denied, 324 U.S. 850, 65 S.Ct. 687, 89 L.Ed. 1410; Walker v. Lee, 9 Cir., 1934, 71 F.2d 622; United States v. Knowles' Estate, 9 Cir., 1932, 58 F.2d 718. We see no good reason in law why such an order, valid if made during the trial, cannot be made at its conclusion, whether or not designated as nunc pro tunc, so long as the matter then pending remains entirely within the jurisdiction of the trial court.

We think it proper to re-emphasize the determinative issues in this case, as we see them, and as found by the able trial judge in giving his reasons for not granting a new trial:

14. In Kemart Corporation v. Printing Arts Research Lab., 9 Cir., 1956, 232 F.2d 897, 905, 57 A.L.R.2d 1234, the taxing of the cost of carbon copies of transcripts of trials was involved. Two carbon copies of the daily transcript were made, and the court allowed as an item of costs one only. We approved such a ruling as being within the discretion of the trial court.

In Marshall v. Southern Pac. Co., D.C. N.D.Cal.1953, 14 F.R.D. 228, the copy of the daily transcript sought to be taxed was not ordered by the judge, "nor requested, furnished, offered to, or used by, the court." As seen by the quotation of the court's remarks in the body of this opinion, the trial judge here did make

frequent use of the "daily" during the trial in ruling on motions and in instructing the jury. This use was in the presence of and obvious to counsel, and was specifically described in the opinion of the trial judge as necessary.

Department of Highways v. McWilliams Dredging Co., D.C.W.D.La.1950, 10 F.R.D. 107, involved use of daily copy of the transcript by attorneys, not by the judge, for their own convenience. The same may be said concerning Republic Mach. Tool Corporation v. Federal Cartridge Corporation, D.C.Minn.1946, 5 F.R.D. 388, at page 388. "It was not ordered or requested by the Court."

"It was plaintiff's claim that this statement [that there was no intention on the part of General Motors to terminate the distributor and dealer franchises to Anderson Buick Company, so long as it continued to penetrate the market and maintain price class performance] was false in that it was not a true and honest statement of the then present and existing policy and intention of the defendant, General Motors.

"Anderson's version of this conversation with Nash was given in great detail by him; and Nash's version was also before the jury. Again, the testimony presented a sharp conflict; a question of veracity was presented for jury determination. Plaintiff's counsel, in his summation, thus referred to it:

" 'This is the conflict in testimony. Now in resolving this conflict, and, of course, it is your task to resolve the conflict, you are entitled to all the help you can get from your own experience in this Court and out of it. You can look at other uncontradicted evidence which bears on this conversation. You can appraise the witnesses and you can ask yourselves was Mr. Nash a truthful witness? Which of these two witnesses am I inclined to believe? You can ask yourselves which in logic and reason probably happened and which story is more consistent with logic and reason.'

"The jury answered these rhetorical questions of counsel by their verdict; they rejected the testimony of Anderson and accepted the testimony of Nash.

"In the second count of the complaint, as amended, the plaintiff alleged 'that in the period from 1937–1941 the defendant, General Motors, formulated and adopted a policy to terminate the distributorship of the plaintiff, Anderson Buick Company, after the plaintiff had developed the market for Buick automobiles, parts and accessories in the territory assigned to it where it would be more profitable for General Motors itself to distribute; that General Motors thereafter did not disclose this plan to the Anderson Buick Company and did conceal it from that company notwithstanding the relationship of the parties which it alleged to have been of such a nature as to require disclosure.'

"Basic to this second claim was the plaintiff's contention that a relationship of trust and confidence existed between plaintiff and defendant by which General Motors was bound in good faith under the law to disclose to it such a policy, if it existed.

"Plaintiff requested the Court to charge the jury that as a matter of law such a relationship did exist; defendant requested the Court to charge the jury exactly the opposite, to wit, that as a matter of law such a relationship did not exist. The Court declined to grant either request and left the relationship to be determined by the jury, based upon the evidence of the nature of the dealings had between the plaintiff and the defendant. The instructions to the jury as to the law applicable to this phase of plaintiff's claim were neither brief nor perfunctory.

"It was upon the issues thus framed by defendant's denial of these claims asserted by the plaintiff that the jury returned a general verdict for the defendant and against the plaintiff, and a special verdict which was a final disposition, adverse to plaintiff, of all of plaintiff's claims." [15]

Finding no error, we affirm.

15. Tr. pp. 510–512 (omitting references).